**NAVAJO TRIBE OF INDIANS**
v.
**The UNITED STATES.**
No. 49692.
United States Court of Claims.
July 15, 1966.

Marvin J. Sonosky, Assoc. Counsel, Washington, D. C., for plaintiff; Norman M. Littell, Washington, D. C., attorney of record.

Floyd L. France, Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, JONES, Senior Judge, and LARAMORE, DAVIS, and COLLINS, Judges.

## OPINION

COLLINS, Judge.

As the result of a series of transactions beginning in 1942, the United States acquired certain oil and gas rights with respect to the Rattlesnake field, an area within the Navajo Indian Reservation. In this suit, which is based in part upon a special jurisdictional act [1] and in part upon 28 U.S.C. § 1505 (1964), plaintiff seeks additional compensation for those rights.

Three separate claims are presented. The first relates to an oil and gas lease, covering part of the Rattlesnake field, which was originally granted to Continental Oil Company in 1942. Subsequent to the discovery of a reserve of helium-bearing gas, Continental assigned the lease to the United States. Plaintiff asserts that the assignment should have been taken on its behalf. The second claim pertains to a lease, executed in 1923, the subject of which was another part of the Rattlesnake field. Plaintiff contends that the Government took from the tribe, without compensation, ownership of the lessee's interest in the gas deposit underlying the 1923 leasehold.

The basis for the third claim is an agreement, entered into in 1945 by the United States and the Navajo Tribe, which permitted the United States to increase its control over the reserve of helium-bearing gas. This agreement, dated December 1, 1945, became effective on July 1, 1947, after its approval by Congress.[2] Plaintiff takes the position that the consideration which it received pursuant to the agreement was inadequate.

We have concluded, for reasons to be explained, that plaintiff is entitled to recover with respect to the 1942 lease and the 1945 agreement, but that plaintiff's claim as to the 1923 lease must be denied.

The three claims will be discussed separately. Detailed findings of fact were made by the trial commissioner, the late Robert K. McConnaughey. His report, as modified by the court, is set forth infra.

## I. *The 1942 Lease.*

■ Before turning to the precise issues relevant to the assignment of the 1942 lease, we must consider the general assertion of plaintiff that, in judging the conduct of the Government, "the most exacting fiduciary standards" must be applied. Defendant does not challenge this concept as such, and we are of the opinion that plaintiff's view is basically correct.

As indicated in finding 6(a), the United States was responsible for supervision of the affairs of the tribe, including, in particular, supervision of oil and gas leases on tribal property. Numerous cases have expressed the notion that, when dealing with Indian property, the Government may be acting as a "trustee." E. g., Seminole Nation v. United States, 316 U.S. 286, 296, 62 S.Ct. 1049, 86 L.Ed. 1480, 1777 (1942); Menominee Tribe of Indians v. United States, 101 Ct.Cl. 10, 19 (1944). In Oneida Tribe of Indians v. United States, 165 Ct.Cl. 487, cert. denied, 379 U.S. 946, 85 S.Ct. 441, 13 L.Ed.2d 544 (1964), Judge Davis pointed out that it was unnecessary to determine whether the relationship between the tribe and the United States was a trusteeship or guardianship in the technical sense. In any event, the circumstances were such that the United States had a special duty of care regarding the property of the Oneidas. 165 Ct.Cl. at 494. The principle expressed in Oneida Tribe of Indians is pertinent to the present case and especially to the matter of the assignment of the 1942 lease. Cf. Seneca Nation v. United States, 173 Ct.Cl. ——, —— (App. No. 14-63, slip op. p. 7) (December 1965).

■ Since the Department of the Interior had an obligation to safeguard the

---

1. Act of June 27, 1947, ch. 158, 61 Stat. 189, as amended by Act of July 29, 1954, ch. 617, 68 Stat. 580.

2. The agreement was approved by Congress on June 27, 1947. See footnote 1.

property of the Navajos when they were dealing with third parties, it is clear that an even greater duty existed when the Department itself entered into transactions with the Indians. Here, the party whose interests were actually or potentially adverse to those of the tribe was the Bureau of Mines, an agency of the Department of the Interior. Plaintiff is correct in asserting that there was, within the Department of the Interior, a conflict of interest. Because of this and because of the Government's special duty toward the Indians, the various dealings must be carefully scrutinized. In considering the claims of plaintiff, we have endeavored to give adequate weight to "fiduciary standards."

The facts pertinent to plaintiff's initial claim can be summarized as follows: The oil and gas lease which Continental Oil Company obtained in 1942 applied to 3,-720 acres of the Navajo Reservation. Helium was specifically included in the terms of the lease. Continental proceeded to drill a well (Navajo No. 1) and, in June 1942, helium-bearing noncombustible gas was discovered. Since Continental had no desire to produce the gas, it indicated to the Bureau of Mines an intention to surrender the 1942 lease to the tribe. The Bureau of Mines was interested in helium production, and, in July 1942, Continental agreed to put the well into condition for testing. The expenses of Continental were to be reimbursed by the Bureau of Mines. When the tests confirmed the presence of helium-bearing gas, defendant began to explore the possibilities of producing helium and constructing a helium plant on the Navajo Reservation.

In August 1942, Continental repeated its intent to surrender the lease. The Bureau of Mines advised Continental of its interest in using the Rattlesnake field as a source of helium. Ultimately, in December 1942, Continental agreed to assign its lessee's interest to the United States. Consideration for the assignment, which became effective on December 17, 1942, was nominal. The Navajos had not been informed of Continental's desire to surrender the lease, and they did not learn of the assignment until after it had become effective.

At the time of the assignment, it was uncertain whether Navajo No. 1 could be completed as a producing well. In March 1943, development of the well was resumed and, in May 1943, it was accomplished. Meanwhile, in January 1943, defendant had entered into a contract for the construction of a helium plant on the Navajo Reservation. It was not until July 1943 that the tribe authorized the granting of the property rights necessary for the plant.

Plaintiff contends that the assignment should have been for the benefit of the tribe. Defendant, on the other hand, argues that, if the lessee's interest had been surrendered to the tribe, plaintiff would have been "worse off." According to defendant, if the Government had not obtained the lessee's interest, there would have been no development of helium production and plaintiff would not have received the benefits which it got. The trial commissioner adopted defendant's viewpoint to a certain extent; i. e., he concluded that the evidence did not show whether plaintiff would have been better or worse off if Continental had surrendered the lease to the tribe. This suggests that plaintiff failed to prove injury. We can accept neither the view of defendant nor that of the trial commissioner. We agree with plaintiff that the Government acted in violation of its obligation to the tribe.

It is understandable that the Bureau of Mines wished to obtain the lessee's interest directly from Continental. Due to the wartime need for helium, the Government desired to proceed with development of the Rattlesnake field as quickly as possible. The Bureau of Mines feared that complications (such as the need for legislation) would result if (1) Continental surrendered the lease to plaintiff and (2) defendant had to acquire the lessee's interest from the tribe. Although the actions of the Bureau personnel may have been in the national interest, they were not consistent with the Government's

duty to the Navajos. Cf. Menominee Tribe of Indians v. United States, supra.

■■ The tribe should have been informed of Continental's desire to surrender the lease. The case is somewhat analogous to that of a fiduciary who learns of an opportunity, prevents the beneficiary from getting it, and seizes it for himself. Under such circumstances, the beneficiary (here the tribe) is entitled to recover. Cf. Ottawa Tribe v. United States, 166 Ct.Cl. 373, 380, cert. denied, 379 U.S. 929, 85 S.Ct. 324, 13 L.Ed. 2d 341 (1964). Of course, plaintiff cannot prove what would have happened if the tribe had been consulted prior to the assignment, but plaintiff's inability is attributable to the failure of defendant to keep the tribe informed. Therefore, the doubts should be resolved in favor of plaintiff. Cf. United States v. Shoshone Tribe etc., 304 U.S. 111, 117, 58 S.Ct. 794, 82 L.Ed. 1213 (1938). Accordingly, we reject defendant's assertion that it is uncertain whether the Government would have proceeded with the project if it had not obtained the assignment from Continental. We shall assume that, if Continental had given up the lease to the Navajos, the Bureau of Mines would then have acquired the lessee's interest from the tribe. In fixing the amount of recovery, we shall attempt to determine what plaintiff would have received if the previously described events had taken place. The matter of the amount of plaintiff's award is discussed in a later part of this opinion.

## II. *The 1923 Lease.*

The basis for plaintiff's claim regarding the 1923 lease is 28 U.S.C. § 1505

(1964), the section dealing with this court's jurisdiction over Indian claims accruing after August 13, 1946. In support of its contention as to the taking of the lessee's interest in the helium-bearing gas, plaintiff advances three alternative arguments, the first of which is that the rights conveyed by the 1923 lease did not include helium.

### A. *The Scope of the Grant*

The pertinent facts can be stated briefly. In December 1923, the Assistant Secretary of the Interior approved an oil and gas lease which applied to 4,080 acres on the Navajo Reservation. The original lessee was S. C. Munoz. Subsequently, Continental Oil Company and Santa Fe Corporation each acquired one-half of the lessee's interest. In 1924, oil was discovered on the land covered by the 1923 lease, and production of oil took place in the following years.

In 1943, after helium-bearing gas had been discovered on the 1942 leasehold, it was decided to drill an additional deep well on the 1923 land. Pursuant to an operating agreement entered into, in May 1943, by the two lessee-companies and the United States, Continental was authorized to drill the new well at the expense of the Government. This well, Rattlesnake 1–G, was completed in August 1943; again helium-bearing gas was found.[3] A trial run took place, and royalties of $115.45 were paid for the gas produced from Rattlesnake 1–G. Then, the well was "shut in." [4]

Part of the consideration paid by the United States to the tribe in connection with the December 1, 1945, agreement

---

**3.** It is important to note the chemical nature of the gas in question. The composition of a typical sample of the gas was as follows:

| | Percentage |
| --- | --- |
| Methane and other hydrocarbons | 17.0 |
| Nitrogen | 72.6 |
| Helium | 7.6 |
| Carbon dioxide | 2.8 |
| | 100.0 |

The helium content, 7.6 percent, was unusually high. Due to the large percentage of nitrogen, the Rattlesnake gas was not combustible. Pure helium is an inert and noncombustible gas.

**4.** A completed well may be "shut in" when current production is not feasible or economically desirable. For example, a gas well might be shut in due to a lack of pipeline facilities. The well is not permanently sealed, but is put into a condition such that production can be resumed in the future.

was advance royalties with respect to helium-bearing gas underlying the 1923 leasehold. The parties assumed that, prior to the agreement, the tribe had a lessor's (or royalty) interest and the companies, the lessee's interest regarding the helium-bearing gas. Plaintiff now challenges these assumptions and asserts that it never parted with its rights to the helium.

Our task is to construe the language of the lease, in particular the clause which stated that the grant was of "all the oil and gas deposits * * * [under the described acreage]." [5] Plaintiff asserts that the term "gas deposits" referred solely to gaseous hydrocarbons, a classification which does not include helium. According to plaintiff, defendant has the burden of showing that the parties to the lease specifically intended it to convey helium.

Plaintiff seeks to draw support from a number of cases in which the issue related to the meaning of grants of "minerals." Among the decisions cited by plaintiff is McKinney's Heirs v. Central Kentucky Natural Gas Co., 134 Ky. 239, 120 S.W. 314 (1909), in which the court construed a conveyance of "all minerals such as coal, iron, silver, * * * zinc or any other mineral of any marketable value * * *." The court held that the conveyance did not include natural gas. 120 S.W. at 317. Although it was a "mineral," there was nothing to show that the parties intended to include natural gas. Other courts have held that, in determining whether a particular substance came within a grant of "minerals," it was

proper to consider both the language of the particular instrument and the circumstances existing at the time. For example, in Dierks Lumber & Coal Co. v. Meyer, 85 F.Supp. 157, 162 (W.D.Ark. 1949), the court attributed significance to the fact that the particular mineral, novaculite or whetstone, was known to exist in the area at the time of the conveyance. According to plaintiff, application of the rationale of the "minerals" cases to the present case leads to the conclusion that helium was not conveyed. Plaintiff points out that helium was not specifically mentioned in the 1923 lease and argues that knowledge of helium was extremely limited during the period in question.

Although defendant disputes plaintiff's view regarding the status of helium in 1923, more important is the fundamental distinction which defendant draws between the "minerals" decisions and the present case.

Defined literally, the term "minerals" is extremely broad. It would encompass liquids, solids, and gases of many different types. Thus, it is understandable that courts refuse to apply a literal definition and seek, instead, to determine what the parties "had in mind" regarding the particular mineral.[6] In the present case, however, the grant was not of "minerals," but of "all the oil and gas deposits." The term "gas deposits" is less broad than "minerals." Moreover, we are not dealing with the relationship between such minerals as coal and natural gas, substances which differ in form and which are produced by different means. The

5. No reported case has dealt with the question of the inclusion of helium in an oil and gas lease. Now pending in the United States District Court for the District of Kansas is a group of consolidated cases involving this issue, Northern Natural Gas Co. v. Grounds, Civil No. KC–1969.

Also, the matter of ownership of helium has been the subject of several law review articles. See, e. g., Holland, Is Helium Covered by Oil and Gas Leases?, 41 Texas L.Rev. 408 (1963); Comment, 12 Kan.L.Rev. 417 (1964); Comment, 62 Mich.L.Rev. 1158 (1964).

6. One of the cases cited by plaintiff represents a different approach, one hardly helpful to plaintiff's position. In Cain v. Neumann, 316 S.W.2d 915, 922 (Tex. Civ.App.1958), the court interpreted a lease, executed in 1918, which conveyed "all of the oil, gas, coal and other minerals * * *." The court held that the grant included uranium. 316 S.W.2d at 922. The broad language of the granting and the royalty clause was unaltered by the fact that, in 1918, the parties may have been unaware of uranium.

gas, helium, was one component of the gas found in the Rattlesnake field.[7]

The position asserted by plaintiff appears to overlook the fact that gases existing in nature do not fall into neat, mutually exclusive categories such as "hydrocarbon" and "non-hydrocarbon." The various elements are commingled. With respect to the Rattlesnake gas, the hydrocarbon content could not be produced separately from the other components, and, even under plaintiff's view, the lessee would have the right to produce the hydrocarbon gases. Perhaps, plaintiff would impose upon the lessee an obligation to produce the gas, extract the helium and deliver the refined helium to the lessor. Of course, it would have been possible for the parties to create such an arrangement. (See the Mineral Leasing Act of 1920, 41 Stat. 438, as amended, 30 U.S.C. § 181 (1964).) However, the lease in question contains no such provisions, and there is no basis for holding that such an understanding arose by implication.

■ We consider defendant's approach to be the proper one. Although the parties to the lease may have been thinking mainly of fuel-type gases, it is still more realistic to presume that the grant included not only hydrocarbons but the other gaseous elements as well. It follows that, whether its percentage was high or low, the helium component was part of the "gas deposit" which passed to the lessee. This conclusion is consistent with what we have determined to be the general intent of the original lessor and lessee. It seems clear that, if Mr. Munoz had discovered the helium-bearing gas shortly after execution of the lease, he could have successfully claimed that his lessee's interest encompassed the reserve.

A second group of cases upon which plaintiff relies is the Oklahoma "casinghead gas" decisions. Casinghead gas is a hydrocarbon substance which is produced from *oil* wells. Modern leases deal expressly with casinghead gas, but older ones did not. The typical older lease provided a one-eighth royalty for oil from an oil well. Regarding gas from a gas well, the lessee's obligation was limited to payment of a flat annual fee (e. g., $100) for each producing well. Thus, a problem arose when casinghead gas became a valuable product, a source of gasoline. If it were considered to be "gas from a gas well," the lessee's obligation, payment of the fixed fee, would have no relation to the proceeds from the sale of the casinghead gas. Another possibility would be to consider the casinghead gas as "oil from an oil well," thus entitling the lessor to a one-eighth royalty.

The Oklahoma courts refused to follow either of the above alternatives. They adopted the following rule:

> * * * If no mention is made of casinghead gas in the lease, and no interpretation to the contrary has been placed thereon by the parties, such casinghead gas remains the property of the lessor and does not pass to the lessee. [Broswood Oil Co v. Sand Springs Home, 178 Okl. 550, 62 P.2d 1004, 1006 (1936).]

On the basis of this rule, plaintiff concludes: "*A fortiori* if casinghead gas, a hydrocarbon, is not oil or gas within the meaning of an oil and gas lease, helium, a non-hydrocarbon, is not a gas deposit within the meaning of an oil and gas lease."

There is no reason to follow the Oklahoma cases. First, the rule has been questioned by the Oklahoma court itself. Broswood Oil Co. v. Sand Springs Home, supra, 62 P.2d at 1006. Secondly, an important distinction is the fact that casinghead gas is gas produced from an *oil* well. It appears that the Oklahoma courts were motivated by a desire to insure adequate compensation for the lessors.

Defendant points out that, in analogous cases, the Texas courts have taken a different approach. Of particular significance is Lone Star Gas Co. v. Stine, 41 S.W.2d 48, 82 A.L.R. 1299 (Tex.Comm'n App.1931). The grantee of "all natural gas * * *" produced gas containing condensate from which gasoline was

---

7. See footnote 3, supra.

manufactured. The grantee had paid substantial consideration for the deed and had obtained the right to take the gas without payment of any further compensation. The grantor sought a royalty based on the value of the gasoline, but the court denied relief. The court held that "all natural gas" included every substance that came from the well as gas. 41 S.W.2d at 49. The Government urges that similar reasoning should be applied to the present case, and, as indicated previously, we agree.[8]

To summarize, plaintiff's "specific intent" theory must be rejected. Fundamental distinctions exist between the present case and those cited by plaintiff.

Even if we were to consider plaintiff's analysis to be valid, it is not at all certain that plaintiff would prevail. Although the evidence regarding the circumstances at the time of the signing of the 1923 lease is scant, there appears to be some merit in defendant's view that the existence of helium was generally known. Also, it is significant that the Department of the Interior acted for the tribe and certainly the Department was familiar with helium.[9]

In addition to relying upon the cases discussed above, plaintiff asserts that the terms of the lease support its view. Plaintiff argues that, under the rule of *ejusdem generis,* the term "gas" in the granting clause is limited to hydrocarbons, i. e., gases associated with oil. We see no reason to apply *ejusdem generis* to a phrase such as "oil and gas," and plaintiff cites no authority for doing so. The royalty clause contains a reference to gas and its use for "ordinary domestic purposes." Also, the lease includes a clause which grants the tribe the right to use gas for schools or other buildings. Plaintiff points out that helium can *never* be used for "domestic purposes" or for heating buildings. Plaintiff's assertion is true with regard to pure helium. Moreover, the gas produced from the Rattlesnake 1–G well was noncombustible and was unsuited for use as fuel. Nonetheless, we are unable to accept plaintiff's conclusion. There was no express reservation of "non-hydrocarbon" or noncombustible gases, and, for the reasons explained above, we decline to create such a reservation.[10]

It may appear that deciding the question of helium ownership against the tribe is inconsistent with the notion that ambiguities in oil and gas leases are to be construed in favor of the lessor. See, e. g., Stanolind Oil & Gas Co. v. Guertzgen, 100 F.2d 299, 301 (9th Cir. 1938); Emery v. League, 31 Tex.Civ.App. 474, 72 S.W. 603, 607 (1903). Certainly, application of the above rule must depend upon the circumstances of the particular case. Regarding the present case, acceptance of plaintiff's view would lead to an unrealistic result, one which would be in conflict with the general intent of the parties. Therefore, it is much more proper to hold that the helium component of the gas deposit passed to the lessee.

B. *Forfeiture*

As an alternative, plaintiff claims that, if ownership of the helium were conveyed

---

8. Another case upon which defendant relies is Hoff v. Girdler Corp., 104 Colo. 56, 88 P.2d 100 (1939). This case did involve a well which produced "helium gas." However, the question whether a grant of "gas" included helium was not actually raised; both parties assumed the affirmative. The issue was whether the lessee had abandoned the lease (by stopping production, etc.).

9. Defendant stresses the fact that, just prior to the execution of the 1923 lease, the Department had revised the lease form to make it apply to "all gas whether it shall be gas from which the casing

head gasoline has been extracted or otherwise." In regard to the helium question, we cannot attribute great significance to the quoted phrase.

10. Unlike the 1942 lease, the 1923 lease did not specifically include helium. It does not follow, however, that the failure to make a specific reference to helium in the 1923 lease means that helium was excluded from the grant. By the same token, there is no reason to attribute significance to the statutory definitions of "natural gas" applicable to state-owned lands in New Mexico and Arizona.

by the lease, then the lessees' rights to the gas were forfeited. Plaintiff's argument is based upon the following provision of the 1923 lease:

> * * * Failure on the part of the lessee to use a gas-producing well which can not profitably be utilized at the rate herein named shall not work a forfeiture of this lease so far as it relates to mining oil, but if the lessee desires to retain gas-producing privileges, he shall pay a rental of $100.00 per annum in advance, calculated from the date of the discovery of gas on each gas-producing well, the gas from which is not marketed nor utilized other than for operations under this lease.

The pertinent facts are as follows: Rattlesnake 1–G, the deep well located on the 1923 leasehold, was completed on August 26, 1943. Since there was no marketing or utilization of gas, the tribe was entitled to receive the rental of $100 per year. The obligation to make rental payments belonged to the lessee-companies, Continental and Santa Fe; however, under their operating agreement of May 1943 with the Government, the companies were to be reimbursed by the Government. Shut-in rental for the year beginning August 26, 1943, was paid on December 31, 1943.

Although (with the brief exception of a trial run in 1944) the well remained in shut-in condition, no further rental payments were made until August 1947. Through inadvertence, neither the companies nor the Government had made the rental payments for the years commencing on August 26 of 1944, 1945, and 1946. After the oversight had been discovered, the Bureau of Mines arranged for payment of the $300 due. The Geological Survey, which supervised operations under oil and gas leases on tribal lands, wrote Continental that payment of the $300 placed the account " in good standing * * *."

It is plaintiff's position that, under the clause quoted above, the lessees' failure to make timely payment of the rental resulted in the forfeiture, on August 26, 1944, of their rights in the gas.[11] Thus, plaintiff seeks to recover the value of the well, Rattlesnake 1–G, and of the lessees' interest in the gas underlying the 1923 leasehold. Defendant rejects plaintiff's interpretation of the provision regarding shut-in rental. We have concluded that defendant is correct in asserting that the lease does not call for forfeiture.

In support of its position, plaintiff cites a group of cases which dealt with the matter of shut-in rental. One such case is Freeman v. Magnolia Petroleum Co., 141 Tex. 274, 171 S.W.2d 339 (1943). The oil and gas lease, which was interpreted in Freeman v. Magnolia Petroleum Co., was to remain in force for a primary term of 10 years and "as long thereafter as oil, gas or other mineral is produced from said land." 171 S.W.2d at 340. The lease called for the payment of a royalty on the value of gas sold, etc., and contained, in addition, a "shut-in" clause which provided for:

> * * * a royalty of $50.00 per year on each gas well from which gas only is produced while gas therefrom is not sold or used off the premises, *and while said royalty is so paid, said well shall be held to be a producing well* under * * * [the clause regarding continuation of the lease]; * * *. (Emphasis supplied.)

No oil or "other mineral" was produced during the primary term which ended on April 7, 1940. In December 1939, a gas well had been completed; however, there was no sale of gas or any use of it off the premises. The lessees did not tender the shut-in royalty of $50 until 4 months after the end of the primary term.[12] The lessors, who had refused to accept the tender, sought cancellation of the lease, and the court decided in their favor. The court stressed the fact that, as of

---

11. Plaintiff acknowledges that, insofar as oil was concerned, the lease continued in force, since the lessees were operating numerous oil wells.

12. For purposes of the present case, there is no material difference between the terms "shut-in royalty" and "shut-in rental."

the end of the primary term, there had been neither actual production nor payment of the rental (which would have amounted to a substitute for production). Having concluded that the lease lapsed according to its terms, the court held that the untimely tender of rental was without effect. 171 S.W.2d at 342. Reasoning similar to that of Freeman v. Magnolia Petroleum Co. has been applied in other Texas cases.[13]

We cannot agree with plaintiff that Freeman v. Magnolia Petroleum Co. and the related authorities require a decision in plaintiff's favor on the question of forfeiture. As defendant points out, the 1923 lease differs materially from the type involved in *Freeman* and, consequently, the basic issue is quite different.[14]

The decision in Freeman v. Magnolia Petroleum Co. did not rest upon an implied requirement of forfeiture. Rather, the court found that neither of the express conditions for continuation of the lease had been met and that, therefore, the lease automatically expired at the end of the primary term. With regard to the present case, the 1923 lease did require payment of the shut-in rental, but it did

*not* go on to provide for automatic termination of gas rights in the event of failure to pay. Defendant is correct in asserting that this distinction is a crucial one.

According to plaintiff, the rule that "courts abhor a forfeiture" is inapplicable to oil and gas leases, and the opposite rule applies. In support of this view, plaintiff cites Kies v. Williams, 190 Ky. 596, 228 S.W. 40 (1921). This argument can best be answered by discussing the very case which plaintiff cites.

In Kies v. Williams, the lessors sought cancellation of an oil and gas lease on two grounds, failure to complete two wells within 1 year of execution of the lease and failure to pay certain rental. Rejecting both alternatives, the court decided in favor of the lessees. 228 S.W. at 41. There is language in the opinion which, taken out of context, appears to be in accord with the view the Navajo Tribe is urging.[15] However, it is essential to realize (1) that the court, in Kies v. Williams, was referring to forfeiture "when the lease contains a forfeiture clause similar to the one here involved * * *" and (2) that the clause in question provided that, unless two wells were

---

13. For example, in Gulf Oil Corp. v. Reid, 161 Tex. 51, 337 S.W.2d 267, 271 (1960), the majority relied, in part, upon Freeman v. Magnolia Petroleum Co., supra. Steeple Oil & Gas Corp. v. Amend, 337 S.W.2d 809 (Tex.Civ.App.1960), involved the same type of shut-in clause; the court held that a lease (which had extended beyond the primary term) was terminated since, on the rental anniversary date established by the conduct of the parties, there had been neither production nor payment of the rental. 337 S.W.2d at 811. In Shell Oil Co. v. Goodroe, 197 S.W.2d 395 (Tex.Civ.App. 1946), the court found the facts to be distinguishable from those in Freeman v. Magnolia Petroleum Co. and refused to cancel a lease (with provisions like those construed in Freeman).

See generally, 96 A.L.R.2d 345 (1964).

Another Texas case cited by plaintiff, Cox v. Miller, 184 S.W.2d 323 (Tex.Civ. App.1944), did discuss the matter of termination, but the lease in question was dependent upon *actual* production. As

the Government contends, Cox v. Miller is of limited relevance.

14. Effective August 13, 1926, the 1923 lease was amended to provide for a term of 5 years (from August 13, 1926) and as long thereafter as oil or gas was found in paying quantities. Thus, by 1944, continuation was dependent upon production from the various oil wells located on the 1923 leasehold. In contrast to the *Freeman*-type lease, there was no provision making the payment of shut-in rental the equivalent of production.

15. The Kentucky court stated, 228 S.W. at 42, the following:

"* * * Oil lease contracts are an exception to the general rule that deeds and other grants of land or an interest therein are to be construed in favor of the grantee and strongest against the grantor, for in this kind of grants the rule is reversed, and the entire lease and all its terms, and especially forfeiture clauses, are construed strongest against the grantee. * * *"

completed within 1 year, "this lease shall become null and void * * *." 228 S.W. at 41. Thus, the provision for forfeiture was expressed clearly and unmistakably. (The clause was not put into effect, since the court found that two oil wells had been completed.)

More relevant to the present case is the interpretation, in Kies v. Williams, of the rental provision which stated that, commencing 1 year after execution of the lease, the lessees "shall * * * pay [rental] at the rate of $365 for each year, quarterly in advance, thereafter, until oil is produced from the land hereof." 228 S.W. at 41. Rejecting the argument of the lessors, the court stated the following, 228 S.W. at 42:

> The failure of the grantees to pay the rentals in advance did not, nor was [it] intended to, work a forfeiture of the lease. * * * If the contract had contained a clause saying, in effect, that a failure to pay said rentals in advance would work a forfeiture of the lease, it would have been enforceable, but in the absence of such a clause the failure to pay the rentals when due did not have such effect. If the grantees should fail to pay the rentals in advance under the lease, the owner of the surface could maintain an action against them.

Thus, the court refused to read into the lease a provision for nullification in the event of failure to pay the rental in advance. Similar reasoning was used in Kelley v. Ivyton Oil & Gas Co., 204 Ky. 804, 265 S.W. 309 (1924), a case involving, *inter alia*, the payment of a flat-fee royalty for a producing gas well. In the latter case, an alternative ground for the court's decision (which was adverse to the lessors) was explained as follows: " * * * a forfeiture of the lease will not be decreed because of arrears of rent or royalty except upon clear language in the lease providing therefor." 265 S.W. at 311.

■ On the basis of the cases discussed above, we reject plaintiff's assertion that, in general, forfeitures of oil and gas leases are favored. The proper rule is that the sanction of forfeiture will not be imposed unless clearly required by the terms of the lease. The 1923 lease does not expressly call for forfeiture of the right to produce gas. It follows, therefore, that plaintiff's argument cannot prevail.

In view of our interpretation of the lease, we cannot agree with plaintiff's assertion that the Geological Survey acted improperly in accepting the late payments. In some cases, the courts, in construing leases, have attributed significance to the conduct of the parties with respect to the instrument. E. g., Davis v. Laster, 242 La. 735, 138 So.2d 558, 96 A.L.R.2d 332 (1962).[16] In the present case, we have not imputed to plaintiff the behavior of the Geological Survey which determined, in August 1947, that the lessees' account was in good standing. On the other hand, our interpretation of the lease has not been colored by the fact that the party actually interested in gas pro-

16. In Davis v. Laster, a gas well was shut in during the primary term. The lessors, for approximately 9 years, paid *delay* rental. The present plaintiff cites a decision rendered in Davis v. Laster by the Louisiana Court of Appeal which held that the lease was forfeited for failure to pay shut-in royalties. 130 So.2d 479 (La.Ct.App.2d Cir. 1961). The intermediate court was reversed by the Supreme Court of Louisiana which ruled that the parties, by paying and accepting delay rentals, had modified the terms of the lease. 138 So.2d at 563. With regard to the matter of forfeiture, the Louisiana Supreme Court quoted, with approval, language from Jones v. Southern Natural Gas Co., 213 La. 1051, 36 So.2d 34 (1948). In the latter case, the court stated that, where a lessee's failure to pay rental was due to a pardonable or mutual mistake, there should be no forfeiture until the lessee had been given an opportunity to correct the error. 36 So.2d at 38.

The Government has argued in the present case that the lessees' rights could not be terminated without giving them 30 days' notice (as provided in the clause regarding "cancellation"). Because of our decision stated above, we need not discuss defendant's argument.

duction was not the lessee-companies, but the United States.[17]

■ To summarize, we have determined that, since the 1923 lease did not expressly provide for nullification of the lessees' right to produce gas, no such sanction should be placed upon the lessees. Accordingly, there is no basis for plaintiff's claim that, upon the nonpayment of the shut-in rental, the tribe became entitled to the gas deposits.

### C. Transfer by the Lessees

Plaintiff's third argument is that, if it did not otherwise own the helium underlying the 1923 leasehold, such ownership was acquired by it under the agreements which went into effect in 1947. The facts relevant to plaintiff's assertion can be explained as follows: The December 1, 1945, agreement of the tribe and the United States provided for the division of the 1923 (and the 1942) leasehold into formations above and below the base of the Hermosa formation. (The helium-bearing gas, which the Government wished to acquire, was located within the Leadville-Ouray formation, beneath the Hermosa.) Further, each lease was to be terminated as to formations under the Hermosa, and those strata were to be surrendered to the tribe. The Navajos agreed to grant to the Department of the Interior a new lease conveying exclusive rights in the oil and natural gas, including helium, below the Hermosa.

The plan envisioned by the December 1, 1945, agreement could not be accomplished without the participation of the lessee-companies. Accordingly, the Government and the two companies entered into a contract, dated September 19, 1946. The companies agreed that, as of the effective date of the contract between the tribe and the Government, the 1923 lease would be terminated as to all formations

beneath the Hermosa and their rights in such formations would be surrendered to the tribe "to the end that the new lease to the Department [of the Interior from the tribe] * * * may become fully effective." In its contract with the companies, the United States agreed to make a net payment of $166,594 for the rights it received from them.[18]

The two agreements were submitted to Congress. Both were approved, and both became effective on July 1, 1947.

■ The above facts should make it clear that plaintiff's claim is without merit. Of course, the lessees surrendered to plaintiff their interest in the sub-Hermosa formations, including their interest in the helium-bearing gas. However, defendant is quite correct in stressing the fact that the surrender to the tribe was not a gift, but was part of an integrated plan. The lessees transferred to plaintiff their rights in the formations below the Hermosa (1) because the United States had compensated them for their interests and (2) in order to make possible the receipt by the Government of a new lease of those formations. As defendant states, the tribe was merely a necessary conduit in the transfer from the companies to the United States. None of the parties to the two agreements contemplated that the tribe would be paid for the rights surrendered by the lessee-companies. For this reason, plaintiff's third argument regarding the lessees' interest in the 1923 lease must be rejected.

In conclusion, with regard to the rights of the lessees in the 1923 lease, plaintiff is not entitled to any recovery.

### III. The 1945 Agreement.

As consideration for the agreement dated December 1, 1945, plaintiff received a total of $147,799. Of this amount $117,336 represented the advance pay-

---

17. Plaintiff cites a number of decisions of the Department of the Interior regarding oil and gas leases on land owned by the United States. Plaintiff's discussion of the decisions indicates that each involved a situation different from the present case.

18. The interests obtained by the United States from the companies were valued at $196,905. Credited against this amount was $30,311, the value of the rights passing to the companies from the United States. See finding 89(g).

ment of royalties on the helium-bearing gas. The remainder, $30,463, was the present worth of the rentals which plaintiff would be entitled to receive from the Government. The amount of prepaid royalties was based upon a formula arrived at by the Bureau of Mines. The Bureau attempted to determine (1) the volume of the deposit of helium-bearing gas and (2) the value, per unit, of the gas; the other elements in the formula were (3) the royalty rate and (4) a discount factor used to reduce to present worth the total royalty payable on the estimated reserve. Plaintiff challenges each of the four elements used by the Bureau of Mines. Our conclusion that, with the exception of the unit value, the Bureau's computation was correct is explained in the following sections.

A. *The Size of the Gas Reserve*

In June 1945, H. H. Hinson of the Bureau of Mines estimated that the recoverable reserve of helium-bearing gas amounted to 12,386,902,000 cubic feet. This estimate (which will be referred to as 12.4 billion cubic feet) was the one utilized in determining the payment to plaintiff. According to plaintiff, the actual size was 47.3 billion cubic feet.

Various estimates of the recoverable amount of gas were made. The first took place in May 1943, just after completion of the Navajo No. 1 well. Others were made as late as 1958, several years after the cessation of production. The study upon which plaintiff relies was prepared, in 1955, by Forest John Sur, an experienced geologist. As explained in the findings of fact, Sur's estimate differed from that of Hinson primarily in two respects, the volume of the zones containing the gas and the percentage of gas in place which was recoverable. Sur concluded that the total volume of the "pay interval" in the Rattlesnake field was 67,200 acre-feet. As the average thickness of the gas reservoir, Sur used 48 feet; as the area, 1,400 acres.

Hinson's estimate of 12.4 billion cubic feet, which was submitted in June 1945, rested upon a determination that the volume of the productive strata was 20,222 acre-feet. It was Hinson's view that the gas was contained in three interconnected porous zones with an aggregate thickness of 26 feet. Furthermore, Hinson found that, because of the nature and the dome shape of the reservoir, the three zones differed in area. The uppermost zone had an areal extent of 1,459 acres and a thickness of 5 feet. The corresponding figures for the next two zones were 757 acres and 5 feet and 572 acres and 16 feet.

The findings which the court has adopted review in detail these and the other estimates. With regard to the volume of the productive zones, Commissioner McConnaughey concluded that the evidence, physical and otherwise, supported the determination of Hinson, but not that of Sur. The commissioner found, for example, that there was no substantial basis for the view of plaintiff's experts that large quantities of gas were contained in cracks, fractures, and solution cavities. The commissioner agreed with Hinson that only in porous rock was a sizable volume of gas located. Similarly, Commissioner McConnaughey determined that the recovery factor used by Sur, 92 percent, was excessive and that the 80 percent utilized by Hinson was proper. It is unnecessary to repeat here the reasons expressed by the commissioner for his rejection of Sur's estimate. It is sufficient to state that plaintiff has not persuaded us that the commissioner's evaluation of the evidence was erroneous. The findings of the commissioner are presumed to be correct and the arguments offered by plaintiff are inadequate to show the contrary. Cf. Davis v. United States, 164 Ct.Cl. 612, 616 (1964).

In asserting that Commissioner McConnaughey took an improper approach, plaintiff stresses the matter of leakage. According to plaintiff, the two gas wells were mismanaged with the result that a vast amount of gas was lost. Plaintiff states that, because the commissioner misconstrued the evidence on leakage, he could not properly evaluate the estimates of the reserve.

The question of leakage will be discussed infra. Even if we were to assume *arguendo* that substantial amounts of gas did leak, this would not mean that the validity of Sur's estimate of 47.3 billion cubic feet is established. Plaintiff appears to suggest that the primary reason for rejecting Sur's estimate was the fact that it greatly exceeded the amount of gas actually produced (approximately 1.2 billion cubic feet). Although defendant argues that great significance should be attributed to actual production, we need not adopt this approach. Commissioner McConnaughey considered a wide variety of factors, including such matters as the character of the rock and the shape of the pertinent strata. Matters of this type provide an ample basis for refusing to accept Sur's estimate, and their cogency does not depend upon the amount of gas produced from the wells.

▬ Another of plaintiff's contentions is that Hinson's estimate of 12.4 billion cubic feet was influenced by a desire on the part of the Bureau of Mines to keep the valuation low. Plaintiff asserts that the Bureau acted in disregard of the fiduciary relationship with the tribe. It is correct that earlier, in May 1944, Hinson had estimated the size of the reserve to be approximately 17 billion cubic feet. Moreover, Hinson was asked by his superiors to reconsider that estimate. He did so and arrived at the lower amount. Despite these facts, we cannot accept plaintiff's assertion that adoption of Hinson's revised estimate was improper. The commissioner's findings were based upon a thorough evaluation of the relevant evidence. He found that Hinson's revised view rested upon a more accurate analysis of the size and shape of the productive zones.[19] We agree with this conclusion and, therefore, with the commissioner's determination that the estimate of 12.4 billion cubic feet was valid and supported by the evidence.

Finally, plaintiff objects to the commissioner's treatment of the matter of destruction of cuttings.[20] In May 1954, cuttings which had been in the possession of the Bureau of Mines were thrown away. This occurred a few days before plaintiff's expert requested permission to see the fragments. According to plaintiff, the Government should be penalized for destroying material evidence. We do not agree. Plaintiff has not shown that the destruction of the cuttings was the result of a deliberate effort to prevent plaintiff from examining them. Furthermore, plaintiff did obtain from another source cuttings from one of the wells, Rattlesnake 1–G. Defendant asserts that plaintiff's experts failed to utilize the cuttings which were available to them. At any rate, this matter does not alter our conclusion as to the validity of the Hinson estimate.

In addition to opposing the Sur estimate, defendant argues that even Hinson's estimate of the recoverable reserve was too large. Defendant points out that the volumes set forth in the later studies, except for that of Sur, were smaller and were more nearly in accord with the amount of actual production.[21] It is unnecessary to determine whether the reserve was in fact less than 12.4 billion cubic feet or to account for the difference between that figure and the amount of gas produced. Since we have found that the reserve was not *larger* than the volume used in computing the contract consideration, it follows that plaintiff is

---

19. Hinson's earlier estimate did not take into account the fact that the reserve was shaped like a dome, i. e., that the two lower zones were smaller in area than the uppermost zone.

20. Cuttings consist of small fragments of the material through which the drill passes.

21. Defendant contends that the pressure-decline method, utilized for certain of the later estimates, is more accurate than the volumetric method which was used by Hinson and Sur.

not entitled to further compensation on this account.[22]

With respect to the matter of leakage, plaintiff objects strongly to the conclusion reached by Commissioner McConnaughey and to his failure to make detailed findings. According to plaintiff, leakage explains the disparity between the original reserve (allegedly 47.3 billion cubic feet) and the amount of gas actually withdrawn from the wells (approximately 1.2 billion cubic feet). The commissioner recognized that, although the question of leakage might be quite material if the estimate of 47.3 billion cubic feet were adopted, the same would not be true if the original reserve were found to be at most 12.4 billion cubic feet. We have concluded that the latter estimate was a proper basis for determining plaintiff's compensation, and we agree that, consequently, the matter of leakage does not have the significance which plaintiff suggests. We have already pointed out that, in rejecting Sur's estimate, we did not attribute prime importance to the fact that a relatively small amount of gas was produced.

In addition, we are unable to accept plaintiff's position that tremendous quantities of helium-bearing gas leaked. Plaintiff did cite numerous "physical facts" in support of its contention. According to plaintiff, the manner in which the two wells were completed and operated was highly improper. For instance, plaintiff charges, with regard to each of the wells, that the cementing of the various strings of casing was faulty and that underground leakage resulted. We do not propose to discuss plaintiff's many specific allegations, but we do note that, regarding virtually all of them, defendant offered explanatory or refutative evidence. Furthermore, although plaintiff stresses its physical and documentary evidence, the fact remains that proof of plaintiff's assertions depended largely upon the testimony of its expert, E. O. Bennett. Commissioner McConnaughey expressed doubt as to the validity of much of Mr. Bennett's testimony, and the commissioner's evaluation of the witness is entitled to substantial weight.[23] See Court of Claims Rule 66.

Commissioner McConnaughey stated that the evidence permitted an inference that, as a result of various difficulties with casing, etc., *some* gas did escape from the Leadville-Ouray formation. We are willing to accept this view. However, we find that plaintiff has failed to prove that the amount of leakage either to other formations or to the surface was substantial.[24] In any case, the evidence pertaining to leakage does not require alteration of our conclusion as to the original size of the gas reserve.

B. *The Value of the Gas*

The second element of the formula used to determine the consideration for the agreement of December 1, 1945, was the unit value of the helium-bearing gas. In determining the advance royalties for the

22. Another point raised by defendant is that, under the agreement of December 1, 1945, the tribe was entitled to additional royalties in the event actual production exceeded the estimate of 12.4 billion cubic feet. Thus, defendant argues that the size of the reserve is not material to the question of whether the amount paid to plaintiff, pursuant to the agreement, was adequate. In view of our conclusion regarding the volume of the reserve, we need not discuss this argument of defendant.

23. Mr. E. O. Bennett testified at both the 1955 and the 1960 hearings. Although the 1955 trial was conducted by former Commissioner George H. Foster, Commissioner McConnaughey presided at the supplemental hearing in 1960. Defendant points out that most of Bennett's testimony regarding leakage was given in 1960.

24. Defendant advanced a number of reasons for concluding that no significant amount of gas could have been lost through leakage. For example, defendant stresses the fact that there was a direct relationship between wellhead pressure and gas production. According to defendant, there was no noticeable reduction in wellhead pressure, except for the decline resulting from production. Defendant states that this phenomenon demonstrates that the vast leakage asserted by plaintiff could not have occurred.

reserve of 12.4 billion cubic feet, it was assumed that each 1,000 cubic feet (or "Mcf") of gas had a value, at the wellhead, of 12 cents.[25]

The valuation of 12 cents per Mcf was originally set forth in a February 15, 1944, report of the Geological Survey. At the pertinent times, there was no competitively established price of helium. The sole producer was the Government. The price of the relatively small amount of helium sold to non-Federal purchasers was fixed by the Government. Moreover, the composition of the gas found in the Rattlesnake field differed significantly from that of the other gases which were used by the Government as sources of helium. Thus, there was no clear-cut basis for ascertaining the worth of the Rattlesnake gas.

On January 3, 1944, after a series of negotiations with the Geological Survey had proved to be inconclusive, the Bureau of Mines proposed a value of 8.86 cents per Mcf. In February, the Geological Survey made its counterproposal of 12 cents per Mcf. The latter figure was arrived at in the following manner: First, utilizing data based on experience (in fiscal 1943) at the Government's Amarillo helium plant, the Geological Survey determined that the commercial price of *refined helium* should be $11.50 per 1,000 cubic feet.[26] Under the manufacturing-allowance formula which the Geological Survey was attempting to apply, it was necessary to subtract from the price the costs of extracting or manu-

facturing the helium.[27] As the amount of such costs, the Geological Survey used $9.78.[28] The difference between the price of one Mcf of refined helium ($11.50) and the manufacturing allowance ($9.78) was $1.72. The unit value at the wellhead of the *helium-bearing gas* was to be found by extrapolating from the amount of $1.72. That is, the next step was to determine how many cubic feet of the Rattlesnake gas were required to provide one Mcf of refined helium.

The Geological Survey adopted the view that 15.726 Mcf of helium-bearing gas were needed to produce one Mcf of helium and, as a result, found the value of the helium content of the Rattlesnake gas to be 10.9 cents per thousand cubic feet.[29] In addition, it was estimated that each Mcf of the Rattlesnake gas would provide, as byproducts, drip gasoline and liquid hydrocarbons with a total worth of 1.17 cents. By adding the values of the helium (10.9 cents) and of the byproducts (1.17 cents), the proposed value of 12 cents per thousand cubic feet was reached. Initially, the Bureau of Mines considered the price of 12 cents to be excessive. Ultimately, however, the Bureau did use that price as the basis for determining the prepaid royalties.

Although asserting that the actual worth of the Rattlesnake gas was considerably less than 12 cents per Mcf, defendant does not object to the use of that value for the purpose of testing the fair-

---

25. The same value, 12¢ per Mcf, was used in computing the amount to be paid to the two companies under their agreement of September 19, 1946, with the Government.

26. The applicable regulation, which is described in the Bureau of Mines report of January 3, 1944, defined the commercial price of helium as 112 percent of 105 percent of the "actual cost" of the helium. As set forth in the regulation, "actual cost" was determined (1) by adding all operating expenses and depreciation and other production costs and (2) at the discretion of the Department of the Interior, deducting income from the sale of residue gas and byproducts.

27. It is important to note the distinction between "actual cost" and the manufacturing allowance. As indicated in footnote 26, "actual cost" included *both* manufacturing and production expenses. The commercial price was determined on the basis of actual cost.

28. Plaintiff's assertion that the Geological Survey erred in its application of the formula is discussed infra.

29. The value of 10.9 cents per Mcf was obtained by dividing $1.72 (the wellhead value of one Mcf of helium) by 15.726 (the amount of Rattlesnake gas required for one Mcf of refined helium).

ness of the compensation for the 1945 agreement. Plaintiff, on the other hand, contends that the gas was worth much more than 12 cents per thousand cubic feet. Plaintiff offers alternative values, the lowest of which is 35 cents per Mcf. Commissioner McConnaughey concluded that 12 cents per Mcf did represent the value of the Rattlesnake gas. He recognized that the computation of the Geological Survey was in part defective, but he was influenced by the fact that the price of 12 cents resulted from extensive bargaining between the Geological Survey and the Bureau of Mines. We are unable to agree with the conclusion of the commissioner.

It is true that the Geological Survey sought to represent the interests of the tribe and that the value of 12 cents resulted from negotiations. Nonetheless, we cannot overlook the fact that the proposal which was finally adopted was based upon an erroneous application of the manufacturing-allowance formula. The Geological Survey deducted from the price of finished helium ($11.50 per Mcf) costs totaling $9.78. The latter amount was supposed to represent the expense (at the Amarillo plant) of "manufacturing" helium, i. e., the cost of extracting helium from gas which had already been produced. However, of the $9.78, the amount of $1.27 was attributable to items which were not costs of "manufacturing" helium, but were costs of bringing helium-bearing gas to the surface.[30] Defendant admits that inclusion of these items in the manufacturing allowance was improper. The effect of the error was to lower the wellhead value of the helium and, correspondingly, the value of the Rattlesnake gas. We are of the opinion that plaintiff is entitled to an appropriate adjustment.

Defendant asserts that if the value of the gas is altered so as to eliminate the effect of the error mentioned above, then a number of other adjustments must also be made. For example, according to

defendant, allowance should be made for the fact that operation of the Navajo plant turned out to be more expensive than operation of the Amarillo plant. The consequence of accepting defendant's view would be to lower substantially the value of the Rattlesnake gas. The matters raised by defendant have valid evidentiary bases, but we cannot accept defendant's contention as to the necessity of making the additional adjustments.

Defendant relies, for the most part, upon information gained from the actual operation of the Navajo plant. Such information was not available at the time the agreement of December 1, 1945, was negotiated. It did not become available until after congressional approval of the agreement in 1947. The trial run, which took place in March 1944, did not afford an adequate basis for determining the cost of manufacturing helium from the Rattlesnake gas. · No substantial production occurred until 1953, long after the effective date of the agreement between the tribe and the Government. In determining whether plaintiff received adequate compensation for that agreement, it would seem inappropriate to give significance to events which took place subsequent to the date the agreement went into effect. Therefore, we are unwilling to charge plaintiff with the fact, developed after 1947, that, despite the high helium content of the Rattlesnake gas, the Navajo plant was more costly to operate than was the Amarillo plant. It was proper for the Government personnel to base their evaluation on the experience at Amarillo, and, in testing the validity of their determination, we will limit our consideration to data available prior to the effective date of the agreement.

If, in 1944, the Geological Survey had properly applied the manufacturing-allowance formula, the non-manufacturing costs of $1.27 would have been excluded. We have already stated that plaintiff is entitled to have this matter corrected. Thus, as the cost of manufac-

---

30. The items which accounted for the "non-manufacturing" costs of $1.27 were depletion of gas rights, depreciation of gas wells, and interest charges on well construction.

ture, $8.51 should be used, not $9.78. Plaintiff asserts, in addition, that the Geological Survey failed to exclude from the "manufacturing allowance" the expense of operating the gas wells. However, since there is no basis for ascertaining or isolating the costs of well operation, no adjustment can be made on that account.

Another assertion of plaintiff relates to the matter of income from the sale of fuel. The gas which was processed at Amarillo yielded two products, helium and fuel. For each thousand cubic feet of helium, the Amarillo gas produced in addition fuel worth $2.33. According to plaintiff, the value of the fuel should be credited against the manufacturing allowance. This would result in an allowance of $6.18 ($8.51, the adjusted amount explained above, less $2.33). We cannot agree with plaintiff's view.

Unlike the gas processed at Amarillo, the Rattlesnake gas was not a source of fuel. This fact in itself provides adequate justification for not considering fuel income in determining the value of the Rattlesnake gas.[31] In valuing the Rattlesnake gas, the Geological Survey included an estimate of the worth of two byproducts, drip gasoline and liquid hydrocarbons. These products accounted for approximately 1 cent of the 12-cent price. We are of the opinion that the

Geological Survey was entirely proper in its treatment of non-helium products[32] and that, in this respect, plaintiff is entitled to no additional benefit.

There is, in addition to the matter of costs, another ground upon which plaintiff attacks the valuation of 12 cents. The Geological Survey utilized, as the amount of Rattlesnake gas required to obtain one Mcf of refined helium, 15.726 Mcf. In determining the latter amount, it was assumed that 80 percent of the helium content of the gas produced from the wells would be recovered and available for sale.[33] Plaintiff asserts that the recovery factor of 80 percent was insufficient and that a more reasonable figure would have been 94 percent. Plaintiff notes that the Amarillo plant yielded 93 percent recovery.

The 80 percent factor was an estimate which was made prior to the initial operation of the Navajo plant. During the trial run of the plant, which took place in March 1944, approximately 76 percent of the helium was recovered. However, the loss of helium was due in part to leaks and other matters which were correctable. Plaintiff states that, during the period 1953 through 1955, the plant achieved recovery efficiency of 91 percent.

Although acknowledging that, for the years 1953–55, recovery at the Navajo

---

31. Plaintiff argues that it was charged with the expense of separating fuel (since Amarillo cost data was used). Defendant denies that any extra costs were attributable to fuel extraction. We need not resolve this dispute. As was true regarding the matter of the expense of well operation, we have no basis for determining the cost of processing the fuel.

32. Defendant asserts that the Geological Survey's estimate of byproduct value (1.17 cents per Mcf of Rattlesnake gas) was excessive and that a more proper figure would be 0.23 cents. This assertion on the part of defendant is one of several which depend upon the actual experience of the Navajo plant, i. e., upon information which did not become available until 1953 and after. For reasons explained previously, we are un-

willing to test the Geological Survey's valuation, arrived at in 1944, on the basis of such subsequently acquired data. Therefore, we will not disturb the estimated byproduct value of 1.17 cents.

33. The factor of 15.726 Mcf of Rattlesnake gas was first set forth in the Bureau of Mines memorandum of January 3, 1944. It was based upon the percentage of helium contained in the Rattlesnake gas (7.63 percent), the percentage of helium that could be "recovered" (80 percent), and a conversion factor of 0.959910. The necessity for conversion resulted from the fact that the temperature and pressure applicable to the refined helium differed from those applicable to the helium-bearing gas.

The following formula was used:
$$\frac{1 \ (\text{Mcf of helium})}{0.0763 \times 0.80} \times 0.959910 = 15.726 \ \text{Mcf.}$$

338

plant exceeded 80 percent, defendant contends that the estimate of 80 percent was not unreasonable for the earlier period. Defendant stresses the fact that, subsequent to the trial run, the equipment was modified substantially. We agree with defendant's conclusion. Regarding such matters as the cost of plant operation, we have rejected defendant's assertion as to the significance of post-1947 experience. Here, to the extent plaintiff relies upon plant operation of 1953–55, the same reasoning is applicable. Tested in light of the information available at the time, the estimate of 80 percent was a reasonable one. It was not improper, in this regard, to differentiate between the Amarillo and Navajo plants. Therefore, we will not replace the estimated recovery factor with 94 percent or any other percentage.

 In conclusion, we have found that, while the unit value of 12 cents was not sufficient, the prices suggested by plaintiff are excessive. Use of the manufacturing-allowance formula was proper; if it had been applied correctly, the allowance for manufacturing costs would have been $8.51, not $9.78. Using the adjusted allowance, the wellhead value of helium is $2.99.[34] This results in a unit value of the Rattlesnake gas of 20.17 cents.[35] We recognize that 20.17 cents represents a value substantially larger than that which resulted from the negotiations between the Geological Survey and the Bureau of Mines and that the lessee-companies were content with the lower price of 12 cents. Nonetheless, we deem necessary correction of the erroneous calculation of the manufacturing allowance. Accordingly, the value of 20.17 cents will be utilized in determining the compensation to which plaintiff is entitled.

## C. *The Rate of Royalty*

The formula used to determine the pre-paid royalties included a royalty rate of one-eighth. According to plaintiff, the rate should have been one-fourth. Plaintiff contends that one-eighth is a minimum royalty applicable to "wildcat" or undeveloped acreage and that property in the vicinity of a producing well brings a higher royalty. Under plaintiff's view, the existence of the two gas wells meant that the leaseholds were "proven territory."[36] Thus, plaintiff asserts that, if the tribe had been represented by independent advisors during the negotiations leading to the 1945 agreement, it would have insisted upon a royalty rate of at least one-fourth.

Defendant denies that the Rattlesnake field was "proven" with regard to production of helium-bearing gas and argues that, in any event, there is no basis for increasing the royalty. One matter stressed by defendant is the fact that both the 1923 and the 1942 leases provided for a royalty of one-eighth.[37] Defendant suggests that the lease (of the formations containing the helium-bearing gas) which the Government received pur-

---

34. The wellhead value is computed as follows:

| Price of refined helium (per Mcf) | $11.50 |
| Less costs of manufacture | 8.51 |
| Value at the wellhead | 2.99 |

35. The unit value is determined in the following manner:

(a) Value of helium content:

$$\frac{\$2.99}{15.726} = \$0.1900 \text{ (per Mcf)}$$

(b) Value of byproducts: 0.0117

(c) Total value: $0.2017 (per Mcf)

36. The meaning, with regard to oil fields, of the term "proven territory" is discussed in Minchew v. Morris, 241 S.W.

215, 217 (Tex.Civ.App.1922). Cf. 74 Stat. 782 (1960), 30 U.S.C. § 226(b) (1964).

37. The 1923 lease provided for a royalty of one-eighth on gas when the average daily production for a month was less than 3 million cubic feet and a royalty of one-sixth when production equaled or exceeded 3 million cubic feet. The latter rate was never achieved.

Under the 1942 lease, the royalty on gas (and oil) was one-eighth, whatever the amount of production.

Defendant states that the royalty rate for each of the leases had been fixed by the Government and that each lease had been sold at public auction to the person offering the highest bonus.

suant to the 1945 agreement must be viewed as a continuation of the 1923 and 1942 leases. Defendant rejects plaintiff's treatment of the new lease as one covering unleased property.

Since he considered the question to be one of law, Commissioner McConnaughey did not decide whether a royalty in excess of one-eighth could be used in evaluating the adequacy of plaintiff's compensation. He declined, for the same reason, to determine the validity of plaintiff's assertion that the Rattlesnake field was "proven." Before dealing with these issues, it should be helpful to review certain pertinent facts.

Prior to the agreements which became effective on July 1, 1947, the Government was the lessee under the 1942 lease and the companies, under the 1923 lease. To enable the Government to obtain greater control over the gas reserve which was located in a sub-Hermosa stratum, each leasehold was divided into formations above and below the Hermosa. As to the upper formations, the old leases continued. The lessees' interests in the lower formations were surrendered to the tribe which then granted a new lease to the Government.[38]

At the time the agreements went into effect, the two wells were in shut-in condition. On the basis of the trial runs and the tests which had been conducted prior to 1947, the various Government representatives believed that the Rattlesnake field was an extremely valuable helium reserve. There is no indication that any of the persons responsible for negotiation of the 1945 agreement considered using a royalty greater than one-eighth.

It should be apparent from the above recitation of facts that neither party's view of the pertinent circumstances is wholly accurate. We agree with defendant that, under plaintiff's theory, insuf-

ficent weight is given to the fact that the Rattlesnake field had been covered by the 1923 and 1942 leases. Also relevant is the fact that the two wells were developed at Government expense. On the other hand, defendant appears to overemphasize the significance of the original leases. The existence of the earlier leases is an important factor, but their terms are not absolutely dispositive of the royalty issue.

In dealing with this matter, more important than general theories are the particular circumstances. The fact that the field was "proven" as of July 1, 1947, i. e., that there was a reasonable expectation of substantial production, does not in itself require acceptance of plaintiff's position as to the one-fourth royalty. Plaintiff states that it is relying not upon legal rules, but upon principles of economics. We are of the opinion that plaintiff's theory is inapplicable to the factual circumstances of this case.

An appropriate way to test plaintiff's argument should be to attempt to determine what would have occurred if the tribe had been represented by independent advisors. We can assume that, in the hypothetical situation, the tribe's representatives would have sought a higher royalty. It seems unlikely, however, that the Government would have acceded to this request. Surely, the Government would have asserted that the one-eighth royalty provided in the existing leases should continue. The respective bargaining positions would also have been affected by the nature of the Rattlesnake gas. In the case of oil or of combustible natural gas, there might have been many potential lessees, but the same was not true of the gas in question.[39] During 1947 and the prior years, the United States was virtually the sole party engaged in the production of helium. Thus, even if the tribe had had independent

---

**38.** The new lease was to continue for a primary term of 25 years and as long thereafter as the sub-Hermosa formations were capable of producing oil or gas and the Department of the Interior elected to use them for conservation or production. In addition, provision was made for the possibility of extension of the primary term.

**39.** There is no indication that the sub-Hermosa formations ever held or were believed to hold oil in commercial quantities.

counsel, there is no likelihood that it could have successfully bargained for a higher royalty. The economic principle which plaintiff urges may be valid with respect to unleased territory believed to contain oil and ordinary natural gas, but we are unable to conclude that, as of 1947 and the preceding years, the principle had any applicability to the reserve of helium-bearing gas.[40]

 In the hypothetical situation, if the tribe's representatives had asked for a one-fourth royalty, the Government would have been fully justified in refusing to pay it. Accordingly, we cannot say that the failure of the Geological Survey to seek a larger royalty constituted a breach of any obligation to the tribe. On the contrary, use of the one-eighth royalty was proper.

### D. *The Present-Value Factor*

The only element of the formula used to compute the payment of $117,336 which remains to be discussed is the present-value or discount factor. In order to compensate for the fact that the tribe would receive *in advance* the royalty attributable to the entire estimated reserve of 12.4 billion cubic feet, the Bureau of Mines applied to the total potential revenue a discount factor of 0.631508. The bases for the latter figure were the assumptions of H. H. Hinson that the reserve would be produced, at a regular rate, over a period of 25 years and that money would earn 4 percent interest. In this way, Hinson determined that the present worth of the right to receive $185,803.53 (the total potential royalty) over a 25-year period was $117,336.[41]

Plaintiff disputes both of the assumptions upon which Hinson's discount factor was based. According to plaintiff, in view of the capacity of the Navajo plant, 10 years should have been used as the exploitation period. With regard to the matter of interest, plaintiff contends that the rate should have been 8 percent rather than 4 percent.

 Commissioner McConnaughey concluded that Hinson was justified in using 25 years and 4 percent. Regarding the period of exploitation, the commissioner took into account the apparent demand for helium, the effective capacity of the plant, the other sources of helium, and certain additional factors. His determination is presumed to be correct, and plaintiff's contentions do not persuade us of the contrary. The same applies to the interest rate. Plaintiff has not demonstrated that the commissioner erred in accepting the rate of 4 percent, a rate equivalent to that received by the Indians on funds deposited in the United States Treasury.[42] Therefore, we agree with the commissioner that the discount factor used by the Bureau of Mines was appropriate.

---

40. Plaintiff refers to competitive bidding in 1959 for oil and gas leases of "proven territory" on the Navajo Reservation. Plaintiff states that the high bids for the respective tracts averaged 46.99 percent royalty. Although plaintiff does not furnish detailed information as to the nature of the tracts leased in 1959, the circumstances must have been quite different from those which existed in 1947 (and previously) with regard to the Rattlesnake field.

41. The Bureau of Mines calculations were as follows:
 (a) Total potential revenue (royalty rate × reserve in Mcf × unit price):
 $\frac{1}{8} \times 12,386,902 \times 12\text{¢} = \$185,803.53$
 (b) Present worth of total potential revenue:
 $\$185,803.53 \times 0.631508 = \$117,336.42*$
 * Rounded to $117,336.

---

42. Defendant points out that plaintiff misconstrues the function of the interest rate. If 8 percent had been used instead of 4 percent, the present worth of the future payments would have been lower. Defendant takes the position, however, that use of 4 percent was proper.

IV. *Amount of Recovery.*

A. *The 1945 Agreement*

We have determined that, except for the unit value of the gas, the Bureau of Mines computation of the advance royalties was correct. We have found that the unit value should have been 20.17 cents per thousand cubic feet, not 12 cents. If the former figure is substituted for the latter in the Bureau's formula, the resulting compensation becomes $197,222.96.[43] It follows that plaintiff is entitled to receive $79,886.96, the difference between $197,222.96 and $117,336. Under the special act, as amended,[44] plaintiff is also entitled to interest at the rate of 4 percent per year, from October 20, 1947, to the date of payment.

In support of its assertion that the amount of advance royalty which it received was inadequate, plaintiff relies upon two alternative theories. The first accepts the basic formula used by the Bureau of Mines, but substitutes different amounts for the size of the reserve and the other elements. We have already rejected plaintiff's versions of the Bureau of Mines formula.

The alternative theory put forth by plaintiff is that of fair market value.[45]

Plaintiff's estimates of the fair market value of the royalty interest range from $417,928 to $1,776,900, depending upon the estimate of the reserve, etc. Commissioner McConnaughey rejected all of plaintiff's proposed market values. Considering the nature of the gas and the various factors relevant to the matter of valuation, we find that the commissioner was fully justified in refusing to accept plaintiff's "fair market values." The method by which the Bureau of Mines computed the worth of plaintiff's interest was preferable.

Pursuant to the 1945 agreement, plaintiff received from the Government advance rentals of $30,463. This represented the present worth, at 4 percent, of 25 years' rental payments for the sub-Hermosa formations. The entire area of 7,800 acres was included and the annual rent was 25 cents per acre.[46]

Before the trial commissioner, plaintiff claimed that, instead of $30,463, it should have been paid $95,074. The latter amount was described by plaintiff as the fair rental value of the right to store or retain gas in the reserve from the 25th to the 50th year of the agreement.[47] Plaintiff also made the asser-

43. The sum, $197,222.96, was determined in the following manner:
$$\tfrac{1}{8} \times 12,386,902 \text{ (Mcf)} \times 20.17\mathcal{c} \times 0.631508 = \$197,222.96.$$

44. Act of June 27, 1947, ch. 158, 61 Stat. 189, as amended by Act of July 29, 1954, ch. 617, § 1, 68 Stat. 580.

45. Plaintiff states that, in computing the market value of the gas reserve, its expert used the earning-power formula. The value determined by this formula is supposed to represent the present worth of future profits, less the cost of all capital facilities.

46. Under the 1942 lease, an annual rental of $1.25 per acre was payable. The rate of 25¢ per acre was determined by apportioning the $1.25 between the formations above and those below the Hermosa. Thus, the companies, which obtained rights to the upper formations, were obligated to the extent of $1 per acre.

The rental of 25¢ per acre applied also to the 1923 leasehold, although the rental obligation provided in the 1923 lease had terminated in 1928.

47. It should be recalled that the term of the new lease was (1) 25 years and (2) as long thereafter as the sub-Hermosa formations were capable of producing and the Department of the Interior elected to use them for conservation or production. The duration of the lease could be extended to as many as 50 years, under a provision to the effect that, for each year during the first 25 in which production was such that a one-eighth royalty would equal or exceed $1,950, 1 year would be added to the term.

tion that the rental payable for the formations below the Hermosa should have been $1.25, rather than 25 cents; and plaintiff now stresses this position.

Commissioner McConnaughey concluded that there was no basis in the record for a finding that plaintiff was entitled to any additional payment for rent or storage. We are in accord with the commissioner's conclusion. In view of (1) the respective rights, as lessees, of the Government and the companies and (2) the terms of the prior leases, it was proper to fix the Government's rental obligation at 25 cents per acre. Regarding the matter of storage, Commissioner McConnaughey was correct in emphasizing the fact that the recoverable reserve did not exceed the 12.4 billion cubic feet for which plaintiff received royalty payments.

■■■ To summarize, we cannot grant plaintiff's exceptions to the portion of the commissioner's report dealing with payment for storage and rental. Similarly, we have sustained the refusal of the commissioner to adopt plaintiff's estimates of the "fair market value" of the lessor's interest. When the Bureau of Mines formula is used with the adjusted unit value of 20.17 cents, the conclusion is reached that plaintiff should receive an additional $79,886.96, plus interest. We hold that, upon payment of that amount, plaintiff will have received consideration for the 1945 agreement which is "in all respects reasonable, fair, just, and equitable."

### B. *The 1942 Lease*

We have already held that the Bureau of Mines acted improperly in preventing the surrender to plaintiff of the 1942 lease and in taking the assignment from Continental of the lessee's interest. Plaintiff is entitled to recover, and we must now determine an appropriate amount.

Plaintiff presents alternative claims, the smallest of which is $1,287,902, plus interest. In our discussion relating to the 1945 agreement, we indicated our unwillingness to accept plaintiff's estimate of the value of the gas reserve. It appears that, to a large extent, plaintiff's valuation of the 1942 lessee's interest rests upon the same data. Thus, as was true of plaintiff's claim with respect to the 1945 agreement, its proposed values of the lessee's interest are excessive.

On the other hand, defendant contends that, as of December 1942, the Rattlesnake gas had only nominal value. Defendant takes the position that, in determining the worth of the gas reserve, the demand for helium on the part of the Government must be disregarded. Defendant relies on the proposition that "just compensation" does not include enhancement in value resulting from the purpose for which the Government is taking the property. Since, apart from the Government, there was no demand for the gas, defendant concludes that in 1942 the reserve had no market value.

■■■ The general notion upon which defendant's argument as to Government-created enhancement is based is sound. See, e. g., United States v. Cors, 337 U.S. 325, 332, 69 S.Ct. 1086, 93 L.Ed. 1392 (1949); United States v. Whitehurst, 337 F.2d 765, 771 (4th Cir. 1964). However, we consider this principle to be inapplicable to the present case. At the time in question, there was no real prospect of finding a private party which would wish to incur the expense of producing the helium-bearing gas.[48] Consequently, the problem of valuation is a difficult one. We cannot, however, accept defendant's conclusion that the worth of the gas reserve was negligible. The notion of fiduciary duty, highly pertinent to the relationship between the Government and the Navajos, was not involved in the cases cited by defendant.

---

48. Defendant points out that Continental transferred the 1942 lease to the Government for nominal consideration. This fact cannot be decisive. It has already been recognized that Continental had no interest in the helium-bearing gas. Moreover, the existence of the maximum acreage limit gave Continental a particular reason for wishing to dispose of the 1942 lease.

Commissioner McConnaughey sought to value the lessee's interest through the use of a method basically similar to that used to determine the consideration for the 1945 agreement. The resulting values were supposed to represent the present worth, in December 1942, of the amounts which a lessee might have realized from the production and sale of the estimated reserve. The commissioner recognized the probability that, because of the various risks involved, a hypothetical purchaser in 1942 would have been unwilling to pay the full "present worth." We consider the commissioner's approach to the problem of valuation to be a sound one. However, since we disagree with certain of the data which he used, it will be necessary to recalculate the various amounts.

As the unit price of the Rattlesnake gas, Commissioner McConnaughey utilized 12 cents per thousand cubic feet. With respect to the 1945 agreement, we adopted the price of 20.17 cents. It should be proper to use the same price in regard to the worth as of December 1942 of the lessee's interest. The price of 20.17 cents, like that used by the commissioner, is based upon 1943 data, but we cannot accept defendant's assertion that use of 1943 data is improper. It is true that, as of December 1942, there was neither a completed gas well nor a helium plant on the Navajo Reservation. However, these matters can best be taken into consideration by making an appropriate reduction in the amount found to be the "present value."

The commissioner's determination was based upon the assumptions that the entire Rattlesnake field contained a recoverable reserve of 12.4 billion cubic feet of helium-bearing gas and that the portion attributable to the 1942 leasehold was 5.9 billion cubic feet. Defendant contends that the recoverable reserve underlying the 1942 leasehold was no greater than 791 million cubic feet, the amount of gas actually produced from the Navajo No. 1 well. We are unwilling to accept defendant's contention. The commissioner was fully justified in basing his apportionment upon the Hinson estimate of 12.4 billion cubic feet, rather than upon the volume of gas produced. It follows that the estimated reserve allocable to the 1942 lease would yield gross proceeds of $1,190,030 (20.17 cents × 5,900,000 Mcf). Assuming regular production over a 25-year period, the present worth of the gross proceeds would be $751,513.47.[49]

The next step in valuing the lessee's interest is to determine the cost of producing 5.9 billion cubic feet of gas. Commissioner McConnaughey estimated that the total expense would have amounted to $264,266.43. He assumed that one well would have been sufficient to produce the reserve located beneath the 1942 leasehold. Defendant takes the position that an additional well would have been required to produce 5.9 billion cubic feet. There is adequate support in the record to warrant adoption of defendant's view, and we are willing to accept as the cost of drilling the second well defendant's estimate of $256,000. Thus, we conclude that production expenses would have totaled $521,402.75.[50]

The amount of the various costs must be adjusted in order to determine their "worth" as of December 17, 1942, i. e.,

---

49. The present worth was arrived at by multiplying the amount of gross proceeds, $1,190,030, by the discount factor, 0.631508.

50. The costs may be itemized as follows:

| | |
|---|---|
| (a) Reconditioning and completing Navajo No. 1 well | $93,883.73 |
| (b) Well improvements | 3,382.70 |
| (c) Miscellaneous costs, 1943 | 1,136.32 |
| (d) Workover | 96,000.00 |
| (e) Field operations | 33,000.00 |
| (f) Drilling additional well | 256,000.00 |
| (g) Maintenance of additional well | 38,000.00 |
| Total | 521,402.75 |

The above list of expenses, proposed by defendant, differs in three respects from the list used by the commissioner. Items (c) and (f) have been added; item (g) pertains to the second well, not to Navajo No. 1.

the sum of money which would have been required on that date to permit the lessee to meet the expenses as they occurred. One method of assigning a "present value" to the costs would be to assume that they would have been spread evenly over the 25-year period. Defendant asserts, however, that, for purposes of ascertaining "present worth," certain of the expenses should not be amortized and discounted. For example, defendant states that the cost of completing the Navajo No. 1 well should not be discounted, since there could have been no production until the well was finished. We consider defendant's treatment of the non-recurring expenses to be valid. When defendant's theory of selective amortization is applied to the various costs, the resulting "present worth" is $356,758.-23.[51] That amount will be utilized.

In order to reach the worth, as of December 1942, of the amount which a lessee might realize from the sale (over 25 years) of 5.9 billion cubic feet of gas, it is necessary to deduct from the present value of the gross proceeds the sum of (1) the one-eighth royalty and (2) the present worth of the expenses. The value which results is $300,816.06.[52]

In determining plaintiff's recovery, it is suitable to use as the first step computation of the present value of a lessee's potential profits. However, it would be unreasonable to hold defendant liable to the full extent of the estimated "present worth." As Commissioner McConnaughey indicated, a purchaser in 1942 would have been cognizant of the risk that the entire estimated reserve could not be produced and sold. Accordingly, "just compensation" for the lessee's interest in the reserve of helium-bearing gas would not amount to $300,816.06. Although a sizable reduction is in order, there is no precise way to determine the amount to be subtracted. We must attempt to arrive at an amount which is fair and reasonable from the standpoint of both parties.

One-half of the "present value" of the lessee's interest in the estimated reserve is $150,408.03. In view of the many uncertainties which existed in 1942, we are of the opinion that, if the Government had paid the tribe $150,408.03 as consideration for the gas reserve, the payment would have been entirely adequate. We hold, therefore, that $150,408.03 is an appropriate measure of compensation for the reserve of helium-bearing gas. Plaintiff is entitled, in addition, to compensation for the lessee's interest in the oil and gas rights in the formations above the Hermosa. Commissioner McConnaughey concluded that the value of the lessee's rights in the upper formations was $35,393. The commissioner's determination was based upon the valuation incorporated into the agreement of September 19, 1946, between the Government and the companies. See finding 132. We are in accord with the commissioner's conclusion in this regard.

Next, we must consider (1) plaintiff's argument regarding the Navajo No. 1 well and (2) the credits claimed by defendant. Plaintiff asserts that it should receive $100,000 as compensation for the taking of the well. According to plaintiff, if the lease had been surrendered to the tribe, it (as lessor) would have obtained all materials and equipment necessary for operation of the well. Plaintiff

---

51. The above sum, $356,758.23, represents the "present worth" of the expenses totaling $521,402.75. The manner in which the "present worth" was arrived at is set forth, infra, in the findings of fact.

52. The resulting value was arrived at in the following manner:

Present worth of gross
proceeds .............. $751,513.47

Less:
One-eighth
royalty ... $93,939.18
Present
worth of
expenses .. 356,758.23 − 450,697.41

Resulting value ....... 300,816.06

places reliance upon section 7 of the lease which provides as follows:

> * * * Lessee shall be the owner of and shall have the right to remove from the leased premises, within 90 days after termination of this lease, any and all buildings, structures, casing, material, and/or equipment placed thereon for the purpose of development and operation hereunder, save and *except casing in wells and other material, equipment, and structures necessary for the continued operation of wells producing or capable of being produced in paying quantities as determined by the Secretary of the Interior, on said leased land at the time of surrender of this lease or termination thereof;* and except as otherwise provided herein, all casing in wells, material, structures, and equipment shall be and become the property of the lessor. (Emphasis supplied.)

Defendant disputes plaintiff's interpretation of the quoted section and states that, if Continental had surrendered the lease, the tribe would have received only the casing in the well and materials necessary to protect the well.

We consider defendant's view to be the correct one. Navajo No. 1 was not a "producing well" as of December 17, 1942. Furthermore, there had been no determination that the well was "capable of being produced in paying quantities." Before such a conclusion could be reached, further development and testing were necessary. At the time of the assignment, the Bureau of Mines expected that the well would be successful, but this was not actually determined until later. Therefore, we must reject the notion that plaintiff would have received all equipment needed "for the continued operation" of the well.

In fact, Continental did not return the lease to the tribe, but transferred it to the Government. At the expense of the Government, the well was completed. With regard to the gas reserve, we have concluded that plaintiff was, in effect, deprived of a property right of ascertainable value. However, we cannot apply the same reasoning to the well. Because of the condition of the well at the pertinent time, Continental's potential right of removal, and the necessity for additional development, we are unable to hold that plaintiff is entitled to compensation on account of the transfer of the well to the Government.

One of the items regarding which defendant seeks a credit is the expenditure of $36,605.43 for testing the Navajo No. 1 well in July 1942. Since we have denied plaintiff's claim with respect to the well, it would seem inappropriate to charge plaintiff with the amount defendant spent on the testing. Therefore, this credit must be disallowed.

The second item for which defendant seeks a credit, rentals of $4,650, is not disputed by plaintiff. Accordingly, to the extent of the rentals, plaintiff's recovery will be reduced.

In conclusion, we have determined that the amount of $150,408.03 represents fair compensation for the lessee's interest in the reserve of helium-bearing gas and have adopted, as the value of the lessee's rights in the formations above the Hermosa, the sum of $35,393. From the total of these two items must be deducted the credit of $4,650. The resulting amount, $181,151.03, represents the net value, as of the date of the assignment, of the lessee's interest.

There remains to be discussed the matter of interest.[53] When a claimant succeeds in establishing that the Government has taken its property without paying just compensation, the court may include as part of the award an appropriate amount of interest. Cf. United

---

53. With respect to the claim based on the 1945 agreement, the special act provided for the payment of interest (at 4 percent) on any award to plaintiff. The provision relating to interest did not extend to the claim based on the assignment of the 1942 lease. The latter claim was to be governed by the law applicable to actions brought pursuant to 28 U.S.C. § 1505 (1964). (See also 28 U.S.C. § 2516).

States v. Creek Nation, 295 U.S. 103, 111, 55 S.Ct. 681, 79 L.Ed. 1331 (1935); Shoshone Tribe of Indians etc. v. United States, 299 U.S. 476, 497, 57 S.Ct. 244, 81 L.Ed 360 (1937); Miami Tribe of Okl. v. United States, 150 Ct.Cl. 725, 743, 281 F.2d 202 (1960), cert. denied, 366 U.S. 924, 81 S.Ct. 1350, 6 L.Ed.2d 383 (1961), overruled re different issue, Pawnee Tribe of Okl. v. United States, 157 Ct.Cl. 134, 140, 301 F.2d 667, cert. denied, 370 U.S. 918, 82 S.Ct. 1556, 8 L.Ed.2d 498 (1962). Under our view of the present case, the Government's actions with respect to the 1942 lease were the equivalent of a taking without compensation. Considering the Government's need for helium, we have determined that, if the lease had been surrendered to the tribe, the United States would then have acquired from plaintiff, if necessary by eminent domain, the interest formerly held by Continental as lessee.[54] As just compensation, plaintiff is entitled to recover $181,151.03, the value of the lessee's rights, plus interest at the rate of 4 percent per year, from December 17, 1942, to the date of payment.

## V. *The Counterclaim.*

The preceding sections of this opinion have disposed of all issues raised by the three claims of plaintiff. Still undecided, however, are the questions pertaining to the counterclaim which defendant asserts.

On March 12, 1952, the Government amended its answer by adding a claim for an offset. Defendant alleged that it had expended for the benefit of the tribe various sums out of (1) gratuity appropriations and (2) reimbursable appropriations. On July 29, 1954, the original special act [55] was amended by ch. 617,

68 Stat. 580. The amendment provided, *inter alia*, that "no offsets shall be deducted * * * from any sum * * * [awarded to plaintiff as additional consideration for the 1945 agreement]." A similar prohibition against "offsets" was provided with respect to the claim based upon assignment of the 1942 lease. Subsequently, plaintiff revised its petition, and, on November 12, 1954, defendant filed a pleading which included a counterclaim. The basis for the counterclaim was an allegation that the Government had spent on behalf of plaintiff "large sums out of appropriations from the Federal Treasury which the Congress has required be reimbursed the United States by the plaintiff." Plaintiff contests the counterclaim.

On November 7, 1955, defendant moved to have the counterclaim tried separately. Over plaintiff's opposition, the motion was allowed by Commissioner Foster. A trial was tentatively scheduled for May of 1956, but it did not take place. Although the pendency of the counterclaim was mentioned in certain papers filed by the respective parties in 1959, no effort has been made, since 1956, to set the matter for trial.

In view of the long delays which have already occurred, it is extremely regrettable that the parties have not seen fit to present to the court, for disposition at this time, all aspects of the case. The papers submitted with regard to defendant's motion for a separate trial show that the parties differed as to the scope of the term "offset." Defendant suggested that the term "offsets," within the meaning of the special jurisdictional act, was limited to claims based upon gratuitous expenditures.[56] Plaintiff

---

54. In Confederated Salish & Kootenai Tribe v. United States, 175 Ct.Cl. ——, —— (Ct.Cl.No.50233, slip op. p. 4) (May 1966), this court pointed out that the breach of a fiduciary duty need not amount to a taking of property. Much more is involved in the present case, as indicated above.

55. Act of June 27, 1947, ch. 158, 61 Stat. 189.

56. Cf. Sioux Tribe of Indians etc. v. United States, 161 Ct.Cl. 413, 315 F.2d 378, cert. denied, 375 U.S. 825, 84 S.Ct. 66, 11 L.Ed.2d 57 (1963).

Regarding reimbursable debts, see the Act of July 1, 1932, 47 Stat. 564, 25 U.S.C. § 386a (1964).

ascribed a broader meaning to the term and asserted that the bar of the special act encompassed defendant's "counterclaim." See S.Rep.No.1785, 83d Cong., 2d Sess. 3 (1954). Nonetheless, since this and related issues are not dealt with in the briefs or arguments which the parties have presented to the court, it would be inappropriate for us to attempt at this time to determine the status of the counterclaim.

Defendant indicates that it expects proceedings regarding the counterclaim to be held after the adjudication of plaintiff's suit. This matter is the subject of an order entered today.

## VI. *Summary.*

Two of plaintiff's claims, those regarding the 1942 lease and the 1945 agreement, were brought on the basis of the special jurisdictional act, as amended. We have determined, with respect to each of those claims, that recovery is in order. As to the third claim, that pertaining to the 1923 lease, we have concluded that plaintiff is not entitled to recover.

The amounts which plaintiff is to receive are $79,886.96 as additional consideration for the 1945 agreement and $181,151.03 as compensation for the taking of the lessee's interest in the 1942 lease. Upon receipt of those sums, plus appropriate interest, plaintiff will have been fully compensated.

The two claims, regarding which plaintiff is entitled to recover, are those covered by the provisions in the special act prohibiting "offsets." As stated previously, the validity of defendant's counterclaim has not yet been determined. Under these circumstances, we deem proper the entry of a separate final judgment in favor of plaintiff to the extent described above. See Court of Claims Rule 47(b) (1964 rev.). However, in view of the fact that the counterclaim is still pending, payment of plaintiff's judgment should be stayed. Cf.

Fed.R.Civ.P. 62(h); 54(b). We hold, therefore, that plaintiff is entitled to a judgment in its favor, but that payment of the judgment shall be stayed until final disposition of the counterclaim.