Davis, Judge,
delivered the opinion of the court:
This motion presents another claim in this many-faceted litigation,[1] a claim resulting from the use under a federal *742 license of tbe Tribes’ land in Flathead Eeservation, Montana, for power-production facilities. The Indians receive annual payments from the licensee, but seek greater compensation. They assert that, at the behest of the Federal Government, the licensee must sell power to a federally sponsored irrigation project at so low a rate as to subsidize that agency and deprive the plaintiffs of the full power value of tbeir land used by the licensee. The defendant moves for summary judgment on three grounds: (i) the Tribes have no com-pensable right to the power value of land utilized for licensed power facilities; (ii) a 1948 statute—giving $400,000 to the plaintiffs—constitutes a full settlement of this claim; and (iii) plaintiffs have suffered no loss by reason of the low rates to tbe irrigation project. We reject on their merits the first two of these defenses and bold that the third must be remanded for trial.
The present Flatbead Eeservation is tbe residue of a very large area once possessed by plaintiffs’ predecessors in tbe northwest. Tbe Treaty of Hell Gate, 12 Stat. 975 (signed in 1855 and ratified in 1859), ceded most of this land to tbe United States, keeping tbe diminished Eeservation “for tbe exclusive use and benefit of said confederated tribes as an Indian reservation.” See Confederated Salish and Kootenai Tribes v. United States, 178 Ct. Cl. 398 (1965). By legislation in tbe early part of this century, Congress compelled tbe Indians to take allotments, opened tbe unallotted lands to non-Indian settlement, in that connection authorized tbe construction of an irrigation system (or project) within tbe Eeservation, and allowed tbe Secretary of tbe Interior to reserve from disposition tribal lands valuable for power or reservoir sites. Act of April 23, 1904, ch. 1495, 33 Stat. 302; Act of May 29, 1908, ch. 216, §15, 35 Stat. 444, 448-50; Act of March 3, 1909, ch. 263, 35 Stat. 781, 795-96. See also Act of March 3, 1911, ch. 210, § 9, 36 Stat. 1058, 1066; Act of August 24, 1912, ch. 388, § 10, 37 Stat. 518, 526-27. One of tbe places within tbe Eeservation so designated by tbe Secretary was a power hydroelectric site on the navigable Flathead Eiver which later became tbe location of tbe Kerr Dam. Thereafter, Congress enabled the Federal Power Commission (with tbe approval of tbe Interior Department) to *743 license such, reserved Flathead sites for power development, and provided that the licensees should pay rentals to the Tribes for the use of these locations. Act of March 7, 1928, ch. 137, 45 Stat. 200, 212-13.
In 1930 the Commission issued a fifty-year license to a subsidiary of the Montana Power Company to use and develop the valuable hydroelectric reserved site (mentioned above) within the Flathead Reservation, and the Kerr Dam was then built and put into operation. The license required the licensee [2] to pay annual rentals or charges to the plaintiff. Also included in the permit was another provision—on which the present claim is rested—requiring the licensee to supply power at relatively low rates to the United States for the benefit of the Flathead Irrigation Project. The Irrigation Project, not operated by or connected with the plaintiffs, is a federally sponsored organization which supplies water, irrigation facilities, and electricity mainly to the non-Indian settlers on the Reservation.
The complaint, as we have indicated, is that this special treatment for the Irrigation Project, enforced by the Federal Government, has caused a serious loss to the Tribes for which they merit compensation. The Indians are entitled to the full power value of the Kerr Dam site, so the argument goes, but have been deprived of a material part of that value by the forced sale to the Irrigation Project at low and preferred rates. They ask for just compensation from the United States whose agencies, the Federal Power Commission and the Secretary of the Interior, insisted on special conditions favoring the Irrigation Project.
I
The most fundamental of the defendant’s answers is that the plaintiffs, although owners of the land on which the Kerr Dam sits, have no legal right, as against the United States, to the power value of a site on a navigable stream. As the Supreme Court has just reaffirmed, there is normally no constitutional right to be paid, on a taking, for power values in- *744 lierent in the condemned location. United States v. Rands, 389 U.S. 121 (1967); United States v. Twin City Power Co., 350 U.S. 222 (1956); United States v. Appalachian Elec. Power Co., 311 U.S. 377 (1940). But Congress can at its option decide, though, not compelled to do so, to pay more than the constitutional minimum of just compensation. United States v. Gerlach Live Stock Co., 339 U.S. 725 (1950); Federal Power Commission v. Niagara Mohawk Power Corp., 347 U.S. 239 (1954); see Sherrill v. United States, 180 Ct. Cl. 914, 381 F. 2d 744 (1967). This principle the Supreme Court has expressly applied to the flow of navigable streams; Congress can if it wishes recognize or confer such private rights. Federal Power Commission v. Niagara Mohawk Power Co., supra, 347 U.S. at 248-56; United States v. Twin City Power Co., supra, 350 U.S. at 225. We think that that was done here.
The history begins with the Indians’ aboriginal ownership of the Kerr Dam land (as well of the entire Reservation) and continues with the Treaty of Hell Grate, supra, which retained the area “for the exclusive use and benefit of said confederated tribes as an Indian reservation.” See United States v. Winans, 198 U.S. 371 (1905). We do not hold—we do not even consider the question—that the Treaty itself gave the Indians the privilege to claim power values if their lands were thereafter taken by the Federal Government. For us the significance of the Treaty is that the later Congressional actions dealing with power development on the Reservation should be integrated, to the extent they can, with this solemn agreement giving the Tribes the “exclusive use and benefit” of the tract (emphasis added).
The first of the directly relevant statutes is the Act of March 3, 1909, ch. 263, 35 Stat. 781, 796, which added the following provision to the Act of April 23,1904, ch. 1495, 33 Stat. 302:
Sec. 22. That the Secretary of the Interior be, and he is hereby, authorized, in his discretion, to reserve from location, entry, sale, or other appropriation all lands within said Flathead Indian Reservation chiefly valuable for power sites or reservoir sites, and he shall report to Congress such reservations.
*745 The Kerr power site was withdrawn under this provision and reported to Congress in 1909. It is possible, of course, that in this Section 22 Congress was thinking, not at all of any benefit to the Indians, but solely of the general interests of the Federal Government vis-a-vis hydroelectric power exploitation. But especially in view of the Hell Gate Treaty’s emphasis on preserving the Beservation for the “exclusive * * * benefit” of the Tribes we think that Congress was not oblivious, in Section 22, of the Indians’ interests; it was not appropriating to the Federal Government, without compensation, the power value of the reserved sites. The phrasing of the statute does not say that and, in our view, should not be read that way, both because of the express words of the Treaty and because legislation dealing with tribal property should be interpreted hospitably to the Indians if it can. Choate v. Trapp, 224 U.S. 665, 675 (1912); United States v. Shoshone Tribe, 304 U.S. 111, 117 (1938) ; United States v. Walker River Irr. Dist., 104 F. 2d 334, 337 (C. A. 9, 1939). Congress was no doubt intent on keeping to the Federal Government the right to direct the future development of these locations, but there is no hint that it wished to carve out the power sites on the Beservation to be treated as if they were no longer owned by the Indians to whom the United States had made its pledge in the Treaty of 1855.
Then, in 1920, Section 10(e) of the Federal Water Power Act, ch. 285, 41 Stat. 1063,1069 (1920), provided that when the Federal Power Commission issued licenses involving the use of tribal lands within Indian reservations “the commission shall fix a reasonable annual charge for the use thereof”, with readjustments at periodic intervals. The Federal Power Act, ch. 687, § 206, 49 Stat. 838, 843 (1935) (which replaced the Water Power Act) followed suit and adopted Section 10(e) with modifications immaterial to our case. These general provisions, while not decisive on the precise point, show that Congress continued to be concerned with Indian interests and rights in reservation power sites.
Specifically pertinent is the Act of March 7,1928, ch. 137, 45 Stat. 200, 212-13, which authorized the Power Commission to license power areas in the Flathead Beservation, and required “That rentals from such licenses for use of Indian *746 lands shall be paid the Indians of said reservation as a tribe, which money shall be deposited in the Treasury of the United States to the credit of said Indians, and shall draw interest at the rate of 4 per centum * * *.” The Kerr Dam location was chiefly in mind. At the House hearings, a high official of the Bureau of Indian Affairs gave that agency’s view “that this power site belongs to the Flathead Indians, and that they are entitled to the net proceeds from the development of the power site.” Hearings before Subcommittee of House Committee on Appropriations, Interior Department Appropriation Bill, Fiscal 1929, 70th Cong., 1st Sess., at 341-42. The Committee members did not express any dissent and seemed to imply agreement.
At the Senate hearings, it was made more explicit that the Committee, as well as the Indian Bureau, took this same position. Senator Wheeler of Montana repeatedly stressed that the power site “belongs to the Indians in our judgment” and noted that the Indians “want to be fully protected to the extent that they are not going to have any of the profits from this matter taken away from them and given to anyone else.” The Senator referred to the 1855 Treaty and to violations of it by the Federal Government, declared that “I am in favor of the development of the project, but I want to see the Indians protected in this matter”, and observed that “The Indians are very skeptical that this property is going to be taken away from them. A great many Indians on the Flathead Reservation in a few years are going to be absolute paupers unless they are provided for, and they feel that this water-power site, belonging to them, is something that will bring in a revenue to them during their lives and during the lives of their children and will keep them from going to the poor house.” The Indian Bureau repeated that its consistent stand was “that the entire net proceeds from this power development on the Flathead Reservation should go to the Flathead Indians”; it made clear that by “net proceeds” it meant that, after the administrative charge by the Federal Power Commission, “we want all the proceeds to go to the Flathead Indians” and “we propose to get the very best proposition we can for the development of the power site and see that all the proceeds go to the Flathead Indians.” *747 Later in the hearings, after a presentation on the part of the plaintiff Tribes, Senator Smoot, of the Committee, noted that “There is no question in the minds of the Committee here but that it [the Kerr site] is on Indian lands, and that Indian rights apply * * * See Hearings before Subcommittee of Senate Committee on Appropriations, Interior Department Appropriation Bill, Fiscal 1929, 70th Cong., 1st Sess., at 19-23, 46-47, 53.
This legislative light, particularly as refracted through the prism of the past history, makes it plain to us that in the 1928 Act Congress recognized and confirmed the Tribes’ right to the power value of the Kerr Dam site and desired them (regardless of constitutional mandates) to be paid for power value. The same concept was utilized and strengthened a year later when Congress waived payment to the Power Commission of the “usual administrative fees and commissions” in issuing licenses “for the development of power or power sites on the Flathead Indian Reservation.” Act of March 4, 1929, ch. 707, 45 Stat. 1623, 1640. The Tribes were not even to bear that normal and routine burden.
What Congress did here was comparable to the many legislative actions recognizing and confirming an Indian group’s title to a reservation or other defined area. See Tee-Hit-Ton Indians v. United States, 348 U.S. 272, 277-79 (1955). Though not required by the Constitution to do so (id. at 279-91), Congress has often conferred compensable rights to land on various tribes by recognizing their title. So in this instance Congress, while free not to do so, decided to recognize the plaintiffs’ rights to the power values and thereby made those interests compensable. The defendant would have it that Congress wished to give the Tribes no more than a limited gratuity in the form of the annual payments to be made by the licensee. We see no such indication. On the contrary, the note struck again and again was that this power site was the Tribes’ own property for which they should be fully compensated.
It remains only to point out that the Federal Power Commission, when it granted the license, took power value into account in fixing the rentals to be paid by the licensee to the *748 Tribes.[3] A Commission regulation at that time (Reg. 14, Sec. 5) provided that for licenses “involving the use of tribal lands embraced within Indian reservations, the Commission will fix a reasonable annual charge for the use thereof, based upon the commercial value of the land for the most profitable purpose for which suitable, including power development(emphasis added). The defendant’s brief admits that the annual charge fixed by the Commission probably includes elements of power value. See also United States v. 5,677.94 Acres of Land, 162 F. Supp. 108, 117 (D. Mont. 1058). The license itself (following Reg. 14, Sec. 5) stipulates that the periodic readjustments of the rentals to the Tribes shall take account of the “commercial value of the tribal lands involved, for the most profitable purposes for which suitable, meluding power development" (emphasis added). And the Commission increased the rentals when the licensee installed a third generating unit (not authorized by the original license) even.though this third unit was not built on tribal lands and “the Indian tribes contributed nothing in addition to what they had already provided.” This was done because the increase in plant capacity “substantially” affected “the interests of the Indians.” Montana Power Co. Project No. 5, 22 F.P.C. 502, 516 (1959); see Montana Power Co. v. Federal Power Commission, 298 F.2d 835 (C.A.D.C., 1962).
Our conclusion that Congress has recognized the Tribes’ right to the water-power value of the Kerr Dam site is strongly supported by the able opinion of the District Court in the closely comparable case of United States v. 5,677.94 Acres of Land, supra, 162 F. Supp. 108 (D. Mont. 1958). There the Federal Government sought to condemn for the proposed Yellowtail Dam, without paying power value, tribal lands belonging to the Crows on the Big Horn River. In a thorough analysis the court held that power value must be paid. The only difference between the cases is that, unlike the Act of March 3, 1909, supra—reserving Flathead Reservation water-power sites from disposition—the Crow Allotment Act of 1920 provided in terms that Crow lands valuable *749 for water-power development should be reserved from disposition “for the benefit of the Crow Tribe of Indians.” Act of June 4, 1920, ch. 224, § 10, 41 Stat. 751, 754. This distinction is one of language, not of substance. In 1920 Congress simply made explicit what, as we have said, was inherent in the 1909 legislation—that the Indians were not to be deprived of benefits as a result of the Congressionally-ordered reservation of tribal lands usable for water power. On this point we have little doubt, but if we had more we would have to settle it, as already pointed out, on the side of the Tribes.
II
The next obstacle, in the defendant’s view, is that the United States paid the plaintiffs for the very claim in suit, via Section 5 (b) of the Act of May 25,1948, ch. 340, 62 Stat. 269, 272, which gave them $400,000 in full settlement “of all claims of said tribes on account of the past use of tribal lands for the physical works and facilities of the irrigation and power systems of the project, or for wildlife refuges” and also “in full payment to said tribes for a permanent easement to the United States, its grantees and assigns, for the continuation of any and all of the foregoing uses * * * *.” [4]
The “project” referred to in this section was the Flathead Indian Irrigation Project[5] which, as noted earlier, is not owned or controlled by the plaintiffs and primarily operates *750 for tbe benefit of non-Indians on and near tibe Reservation. It was authorized by Congress in 1908 (Act of May 29,1908, ch. 216, § 15,35 Stat. 444,448-50) and was substantially completed by the mid-1940’s; first administered and paid for by the Department of the Interior, the Project divisions later became state corporations, owned and controlled by the water users, and under contract with the Federal Government to assume, ultimately, the Project’s construction costs. The Project’s facilities—the irrigation system (including canals and laterals) and power-distribution systems (including transmission lines)—were constructed on tribal lands, but until the 1948 Act no payments were made to the Tribes for this use of their property. This led to a festering controversy between the plaintiffs and the Project.
It is also very important to observe that the Irrigation Project has power distribution systems which are entirely separate and distinct from the hydroelectric production system built and operated by the Montana Power Company at and incident to the Kerr Dam. Under the license to that company, the Project’s distribution systems received the exclusive right (together with the United States) to sell power within the Flathead Reservation (up to a certain limit). But the Project has, and has had, no interest at all in the Kerr Dam site.
Against this background, the 1948 award of $400,000 is highlighted as a payment to the Tribes on account of the liability of the Federal Government and the Irrigation Project for the use of tribal lands for (i) the facilities of the irrigation system and (ii) the Project’s distribution power systems, not the Montana Power Company’s production system centered on the Kerr Dam. The only reference in Section 5 to “power systems” is to “power systems of the project" (emphasis added), and the only power systems the Irrigation Project has ever had are its distribution systems. One-half of the payment was in full settlement of past uses of tribal lands for those power systems (as well as the irrigation facilities and a wildlife refuge). The other half was in full payment for an easement “for the continuation of any and *751 all of tbe foregoing uses, whether heretofore or hereafter initiated upon the tribal lands now used or reserved for the foregoing purposes” (emphasis added). The “foregoing uses” and “foregoing purposes” were only those of the Project’s power distribution systems (and the other two non-power functions). Confirmation that the payment was related to the Project’s own power systems is the requirement that the $400,000 “shall be added to the construction costs of the project and shall be reimbursable.” It would be extraordinary to charge payments attributable to the Kerr Dam facilities to the Irrigation Project alone.
The 1948 Act’s legislative history bears out this reading. The House committee report described the Irrigation Project (which was the subject of the entire statute) as including an irrigation system and a “power system consisting] of 410 miles of distributing lines, a 820-watt generating system, and several substations. The system serves some 8,700 customers and there .[are] now on file between five and six hundred applications for connection by small users.” H.E. Eep. No. 1691, 80th Cong., 2nd Sess., at 1-2 (1948). The report added that one of the purposes of the bill was to “permit the construction of additions and improvements to the irrigation system and the power system so that new customers may be connected and present ones better served.” Id. at 2. The Under Secretary of the Interior pointed out to the Committee, with respect to Section 5(b), that “the whole sum of $400,000 is to be added to the reimbursable construction costs of the project, and is to be repaid to the United States by the water users and power users of the project. Adoption of subsection 5 (b) would resolve a long-standing controversy in a way materially agreeable to both the Indians and the irrigation district concerned, and would facilitate the efficient operation of the project.” Id. at 7-8. The Senate Committee report copied that of the House. S. Rep. No. 1234, 80th Cong., 2nd Sess. (1948).
These statements show that the Congressional Committees and the Department of the Interior were indeed thinking of the Irrigation Project’s distribution system, not of the Mon *752 tana Power Company’s Kerr Dam production development, when they were considering the $400,000 payment to the Tribes. The excerpts from the Committee bearings on tbe bill (covering much more, of course, than Section 5(b)) offered us by the defendant do not contradict this conclusion in any way; one of them (the testimony of the Tribes’ representative) confirms it, and the others deal with the wholly separate problem of whether the plaintiffs suffered any loss by reason of the preferred rates given by the license to the Irrigation Project. See Part III infra.
It follows from both the wording and the legislative history of Section 5(b) of the 1948 Act that the $400,000 payment there authorized was not in settlement or payment of the present claim which remains fully alive.
Ill
Finally, the Government argues that the provisions of the license to Montana Power Company, now challenged by the plaintiffs, caused no loss to them and therefore that nothing can be owing. Certain statements of officials and others, at various times in the past, are cited in support. The Tribes rightly answer that this is a matter for the proofs and that defendant has not contended, and cannot properly, that there is no factual dispute on this issue. The bits of testimony and argument which the Government now presents are not enough to demonstrate that a trial is unnecessary. Summary judgment cannot be awarded on a controverted factual question of this kind.
We hold, accordingly, that defendant’s motion for summary judgment is denied in all aspects and that the case is remanded to the commissioner for trial or other appropriate further proceedings.
Collins, Judge, took no part in the decision of this case.

 under a special jurisdictional Act of July 30, 1946, ch. 701, § 1, 60 Stat. 715, authorizing a suit to adjudicate “any and all legal and equitable claims of whatsoever nature” the plaintiffs had against the united States, the Tribes filed a petition raising a number of separate claims. For opinions passing on others of these demands, see 167 Ct. Cl. 405 (1964) ; 173 Ct. Cl. 398 (1965) ; 175 Ct. Cl. 451, cert. denied, 385 U.S. 921 (1966).

 Sometime after issuance, the license was transferred to the Montana Power Company, which is now the formal licensee.

 Plaintiffs contend, of course, that the favorable rates to the Irrigation Project, which the Commission also inserted in the license, prevented that agency from giving full credit to the power value.

 The full test of Section 5, paragraph (b), is as follows:
“The sum of $400,000 to be deposited in the united States Treasury to the credit of the Confederated Salish and Kootenai Tribes of the Flathead Reservation in Montana; of which sum one-half shall be in full settlement of all claims of said tribes on account of the past use of tribal lands for the physical works and facilities of the irrigation and power systems of the project, or for wildlife refuges; and the other one-half shall be in full payment to said tribes for a permanent easement to the United States, its grantees and assigns, for the continuation of any and all of the foregoing uses, whether heretofore or hereafter initiated, upon the tribal lands now used or reserved for the foregoing purposes. The said tribes shall have the right to use such tribal lands, and to grant leases or concessions thereon, for any and all purposes not inconsistent with such permanent easement. The amount deposited in the Treasury pursuant to this subsection shall be added to the construction costs of the project and shall be reimbursable.”
The $400,000 was paid pursuant to the Appropriations Act of June 23, 1949, ch. 236, 63 Stat. 231, 241.

 The entire Act of May 25, 1948, deals with the Irrigation Project, and the first section declares that the “Flathead Indian irrigation project in Montana” is “hereinafter called the project.”