The CONFEDERATED SALISH AND KOOTENAI TRIBES OF the FLATHEAD RESERVATION, MONTANA

v.

The UNITED STATES.

No. 50233.

United States Court of Claims.

Nov. 14, 1969.

Skelton, J., dissented.

See also, 401 F.2d 785, 185 Ct.Cl. 421.

Richard A. Baenen, Washington D. C., for plaintiff; Glen A. Wilkinson, Washington, D. C., attorney of record. Wilkinson, Cragun & Barker, Washington, D. C., of counsel.

John D. Sullivan, Washington, D. C., with whom was Asst. Atty. Gen. Shiro Kashiwa, for defendant.

Before COWEN, Chief Judge, LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

OPINION

PER CURIAM:

In Confederated Salish and Kootenai Tribes v. United States, 181 Ct.Cl. 739 (1967), the court held that plaintiffs stated a valid claim in paragraph 13 of their petition. This cause of action was that under the provisions of the license issued by the Federal Power Commission to the Montana Power Company—which license included the company's use of a site on the Tribes' land in the Flathead Reservation, in connection with the licensee's power project on and along the Flathead River and Flathead Lake—the defendant required the company to sell power to a federally-sponsored irrigation project at a low rate which subsidized that agency and de-

prived plaintiffs of the full value (including power value) of their lands used by the licensee. The plaintiffs seek full just compensation, including power value. At the earlier stage of the case, we held that, if the plaintiffs did suffer such a loss, they were entitled to full compensation under various Congressional enactments (181 Ct.Cl. at 743–749), and that the claim had never been settled or released (181 Ct.Cl. at 749–752). Since the parties were in dispute whether a loss was actually suffered, we remanded the case for trial (or other appropriate proceedings) on that issue (181 Ct.Cl. at 752).

A trial was then held at which exhibits and oral testimony were introduced. On the basis of this record, the trial commissioner concluded that the plaintiffs had failed to prove that they "were deprived of the full power value of the Tribes' land used by the licensee". The case is again before us on plaintiffs' exceptions to the commissioner's report.

Unfortunately, the record, as it comes here, seems to us inadequate for final disposition of the case. The existence and amount of the plaintiffs' loss, if any, has not been properly canvassed. This is primarily because the plaintiffs misapprehended what they were expected to prove, and accordingly their proof does not jibe with the applicable rule of damages. Their showing on value was directed solely to the amount it would have cost the Federal Government to purchase from the Montana Power Company, under certain of that company's regular 1930 rate schedules, the block of 15,000 horsepower which the license required the company to sell at relatively low rates to the United States for the benefit of the irrigation project. As the trial commissioner indicated in his memorandum opinion, this is a measure of what the United States gained—i. e., what the

United States would have had to pay for the power if it had had to buy it at regular rates—not a measure of what the plaintiffs lost from the taking of their lands (including the lands' power value). The correct test, of course, is what, if anything, the Tribes lost from the requirement that the licensee sell the 15,000 horsepower to the Federal Government at the lesser rates specified in the license. No effort was made to show that detriment. Obviously, the 1930 power company schedules, on which plaintiffs have relied, have no real connection with the extra amount which a licensee (the Montana Power Company or any other) would have been willing to pay the Indians, in an arms-length transaction, in the absence of the requirement for the special sale of the 15,000 horsepower. But that additional sum is the only true measure of the Tribes' loss, if there was any. It has not yet been found.

One solution would be to say that the plaintiffs have had their chance, as the claimants, to prove their loss, and having failed to do so under the proper standard they should now be dismissed, without being accorded another opportunity. This is the stand the trial commissioner may have taken. We do not, however, follow that course for several reasons. The first is that the present record, defective though it is, does indicate that the power company probably incurred an annual loss in supplying the 15,000 horsepower to the Federal Government.[1] From that significant fact it would appear, at least *prima facie*, that the licensee would probably have been willing to raise its payments to the Indians, to some extent, if that loss were removed. The serious problem posed by this fact of a substantial annual loss for the licensee on the required sale calls for further exploration to see whether, in fact, the loss on the sale of this block of 15,000

1. At the hearings before the Federal Power Commission, prior to the award of the license, a representative of the company testified that the annual out-of-pocket loss would be $62,500. Assistant Commissioner of Indian Affairs Scattergood calculated that the loss would be $25,336. The present record does not contain enough information to resolve this conflict.

horsepower would have any effect on the rentals payable to the Tribes.[2]

Second, our prior opinion was not explicit on the proper measure of plaintiffs' loss and, consequently, may not have warned plaintiffs against the course they followed at the trial. Since the parties put no emphasis, at that point in the case, on the measure of the loss, and we were remanding for trial on that issue, we did not treat expressly with the standard. Though we see nothing incorrect or misleading in our opinion, the incidental references to "power value"— which were pertinent to the then issue of whether Congress had agreed to pay for the power value incident to the Tribes' land [3]—may have been taken by the plaintiffs as sanctioning the incorrect measure they proposed at trial, i. e. the market value of the power to be sold by the power company to the Federal Government.

Third, we are not certain that the trial commissioner adopted the correct standard for the loss to the Indians from the compulsory sale to the United States. Much of his short memorandum opinion reads as if he probably did apply the proper measure, but he does not spell out his reasoning in enough detail for us to be sure. For instance, he does not refer to, or deal with, the significant fact that the company probably suffered a substantial loss on the lower-price sales for the benefit of the irrigation project.[4]

Finally, we cannot forget that this is a litigation brought by Indian Tribes to redress an alleged wrong by the Government which has long supervised their affairs. Though we do not lean over backwards in such a case, we are somewhat more lenient in procedural matters than we might be in other classes of cases in which the relationships of the parties are not so special.

For these reasons, we do not hold the plaintiffs strictly to their failure, up to now, to prove the existence and the amount of any loss they may have incurred. Instead, we remand the case to a trial commissioner for a new trial, vacating the prior commissioner's opinion and findings so that the parties can start afresh and direct their presentation to the correct measure of damages.[5]

So that there be no mistake, we stress that we are in no way holding that plaintiffs have yet proved any loss, let alone the amount of such a loss. The issue of the existence of a loss, as well as of the amount, remains to be tried again. To recover, plaintiffs must prove that a supposititious willing buyer desiring to develop the site for power purposes, and able to obtain the necessary license, would have paid, and a willing owner would have accepted, a higher rental than the amount actually paid, if the former had not been burdened with the necessity to sell at the prescribed rate the block of 15,000 horsepower to the Federal Government, and then the plaintiffs must show the probable amount of that excess.

The commissioner's memorandum opinion and findings, filed December 3, 1968,

---

2. The present record contains opposing contemporary conclusions on this point —Assistant Commissioner Scattergood thought that the Indians' return was not affected, while others thought it was and would have to be—but there is very little analysis of the problem, and none in any depth.

3. At that juncture, the main question was whether Congress, although not compelled by the Constitution to compensate the Indians for the water power value of their lands taken for the power project, did undertake to do so in various pieces of legislation, particularly the Act of March 7, 1928, ch. 137, 45 Stat. 200,

212–213. The court held that Congress did so intend.

4. It may also be that the commissioner believed that the United States gave more of a *quid pro quo* for these sales than it actually gave. Plaintiffs insist that he made factual errors in this connection.

5. The court has denied, as untimely, a post-argument motion by the Flathead, Mission and Jocko Valley Irrigation Districts to file a post-argument brief *amici curiae* in support of the defendant. However, these parties are hereby granted leave to participate as *amici curiae* in the further proceedings before the commissioner, if they wish to do so.

are vacated, and the case is returned to a trial commissioner for further proceedings in conformity with this opinion.

SKELTON, Judge (dissenting):

I respectfully dissent. In my opinion, the court must start with the proposition that we held in our prior opinion in this case (181 Ct.Cl. 739 (1967)) that the plaintiffs were entitled to be paid for the "power value of their tribal lands." The defendant there contended that the plaintiffs had been paid the power value of their lands, but the plaintiffs argued this was not so. The contentions of the parties were stated in our opinion as follows:

> Finally, the Government argues that the provisions of the license to Montana Power Company, now challenged by the plaintiffs, caused no loss to them and therefore *that nothing can be owing.* * * * The Tribes rightly answer that *this is a matter for the proofs* * * *. Summary judgment cannot be awarded on a controverted factual question of this kind. [Emphasis supplied.] [Id. at 752.]

With the case in this posture, we sent it back for a trial to allow the plaintiffs to prove, if they could, that under the license of May 23, 1930, they were deprived of the full power value of their lands used by the licensee. They did not make this proof at the second trial, nor did they even attempt to do so, notwithstanding the knowledge and information gained from our prior opinion as well as that obtained from literally dozens of pre-trial conferences held by the trial commissioner as to the issue and burden of proof at the second trial. They contented themselves by attempting to prove the value of the power received by the government from the licensee after the license was granted. The trial commissioner properly held this to be insufficient. In my opinion, to allow proof of the power value of the tribal lands in this fashion would be somewhat like allowing a condemnee in an eminent domain case to prove he was not paid the full value of his land in the condemnation proceedings by showing, after the condemnation is completed, the profit made by the condemnor in selling gravel from the land after it got title. After all, it is the loss to the owner and not the gain to the taker that is compensable. United States v. Miller, 317 U.S. 369, 375, 63 S.Ct. 276, 87 L.Ed. 336 (1943); and United States v. Twin City Power Co., 350 U.S. 222, 228, 76 S.Ct. 259, 100 L.Ed. 240 (1956).

The majority, in sending the case back for another trial, is giving the plaintiffs a second chance to prove what they should have proved, if they could, at the last trial, namely, that the license deprived them of the full power value of their tribal lands, and how much. So, we are back where we were when we handed down our prior opinion. The majority acknowledge they are being lenient toward the plaintiffs and that they "do not hold the plaintiffs strictly to their failure, up to now, to prove the existence and the amount of any loss they may have incurred," because they are Indians. For this reason, the case is being remanded to the trial commissioner so that the plaintiffs may have a second chance to prove their case. Does the majority mean, at least by inference, that if the plaintiffs were not Indians they would not be given another trial? I do not agree with this reasoning or with what appears to me to be preferential treatment being given the plaintiffs in this case because they are Indians. This is not a case where the Indians are appearing *pro se* without the advice and services of counsel. In fact, they are represented by one of the ablest, most skillful and experienced law firms in the country in the field of Indian litigation.[1] It

---

1. The plaintiffs' attorneys were leading counsel in a case in which the largest judgment ever awarded by this court in an Indian case, or any other kind of case, was given ($31,938,473.43). See Confederated Band of Ute Indians v. United States, 117 Ct.Cl. 433 (1950), and Confederated Band of Ute Indians v. United States, 120 Ct.Cl. 609 (1951).

seems to me that when Indians appear before this court represented by able counsel, as in this case, we should give them the same fair treatment and consideration we give to all other litigants who are so represented in our court.

Finally, I do not agree with the measure of damages and standard of proof the majority has prescribed for the second trial of the issue involved in this case, which is:

\* \* \* To recover, plaintiffs must prove that a supposititious willing buyer desiring to develop the site for power purposes, and able to obtain the necessary license, would have paid, and a willing owner would have accepted, a higher rental than the amount actually paid, if the former had not been burdened with the necessity to sell at the prescribed rate the block of 15,000 horsepower to the Federal Government, and then the plaintiffs must show the probable amount of that excess.

This statement (except for the last clause) is apparently an attempt on the part of the majority to define "power value" of the lands in question. I think it is deficient for the following reasons:

It does not take into consideration the contributions of the government to the project such as land, water, money and other property as found by the trial commissioner, but makes it appear that everything connected with the project was contributed by and owned by the plaintiffs. In other words, the definition does not take into consideration all of the facts and circumstances then and there existing at the time of the taking—it only emphasizes the 15,000 horsepower burden on the license, much of which was not prime power, but was worthless surplus or "dump" power which would not otherwise have been sold or used.

The statement concludes by saying "the plaintiffs must show the probable amount of that excess" (if any). This appears to be highly speculative, indefinite and uncertain. A "probable" amount of excess would hardly support a judgment of any kind.

Even if the definition is applied to conditions and circumstances as they existed in 1930, which of course would have to be done, the plaintiffs will no doubt find that they have an impossible burden. It is highly unlikely that any responsible person can be found today, almost 40 years after the license was issued, who would give credible testimony that any "supposititious" (supposed, imaginary, hypothetical) company would have paid more in 1930 than the licensee paid if the 15,000 horsepower had been omitted. The purchase of such a license by a power company involves many factors such as need, costs, markets, plants, rates, locations, capital, distribution systems, investigations, evaluations, future plans, and many others, including decisions by its officers and directors. These factors constantly change. The testimony of anyone attempting to apply the "willing seller"—"willing buyer" test to the situation existing in this case 40 years ago will probably be so highly speculative and conjectural as to be without any probative value.

I think that the issue here is, and always has been: Were the plaintiffs paid the full power value of their tribal lands, and if not, what was the deficiency? The burden was on the plaintiffs to prove they were not so paid and the amount of the deficiency. This they have not done, and it is very doubtful if they can do so even with a second trial.

To put it another way, the plaintiffs must prove that the power value of their tribal lands at the time the license was issued in 1930, under all the facts and circumstances then and there existing, was more than that found and fixed for it by the Federal Power Commission, and how much.[2]

2. Except for the generosity of the government, the plaintiffs would be entitled to nothing whatsoever for the power value of their land. This is because the power dam in this case is located on a navigable stream in which the government owns

In my opinion, the trial commissioner was correct when he found:

8. The evidence does not establish that under the license issued on May 23, 1930, plaintiffs were deprived of the full power value of the Tribes' land used by the licensee. [Commissioner's Memorandum Opinion filed December 3, 1968.]

I would adopt the commissioner's opinion and dismiss plaintiff's suit.

the water power and can exclude riparian owners from its benefits without compensation, or grant the same, as it

chooses. United States v. Twin City Power Co., *supra.*