The **CONFEDERATED SALISH AND KOOTENAI TRIBES OF the FLATHEAD RESERVATION, MONTANA**

v.

The **UNITED STATES.**

No. 50233.

United States Court of Claims.

Oct. 13, 1972.

Richard A. Baenen, Washington, D. C., for plaintiff; Glen A. Wilkinson, Washington, D. C., attorney of record; Wilkinson, Cragun & Barker and Charles H. Gibbs, Jr., Washington, D. C., of counsel.

Edward J. Grenier, Jr., Washington, D. C., amici curiae, The Flathead, Mission, and Jocko Valley Irrigation Districts; Frank J. Martin, Jr. and Sutherland, Asbill & Brennan, Washington, D. C., of counsel.

John D. Sullivan, Washington, D. C., with whom was Asst. Atty. Gen. Kent Frizzell, for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS and KUNZIG, Judges.

## OPINION

PER CURIAM:

This is the third time the claim set forth in paragraph 13 of plaintiffs' multi-claim petition has come before us. In

Confederated Salish and Kootenai Tribes v. United States, 181 Ct.Cl. 739 (1967), we held that a proper claim had been stated on the pleadings. In Confederated Salish and Kootenai Tribes v. United States, 417 F.2d 1340, 189 Ct.Cl. 319 (1969), after a trial, we returned the case for a full new trial, and set forth in our opinion what plaintiffs would have to show in order to recover. The second trial was had before Trial Commissioner Harry E. Wood who has filed a report recommending that the claim be dismissed as unproved. After hearing oral argument and considering the briefs of the parties and the amici curiae, we agree with the trial commissioner and adopt his opinion, findings of fact (with a few modifications), and recommended conclusion. His opinion, which follows the directions in our decision in 417 F. 2d 1340, 189 Ct.Cl. 319, and which we adopt, is set forth in Part One of this opinion. We also discuss, in Part Two, *infra,* certain issues, stressed before us by the plaintiffs, which they contend the commissioner neglected; our holding is that these matters do not require any revision in the commissioner's conclusion.

## PART ONE

### OPINION OF COMMISSIONER WOOD

In this claim, one of several brought under a special jurisdictional act,[1] plaintiffs allege that under the provisions of Federal Power Commission License No. 5, Montana, issued in 1930 to the Rocky Mountain Power Company, which license included the use of tribally-owned Flathead Site No. 1 in connection with the licensee's power project on and along the Flathead River and Flathead Lake, defendant required the licensee to make available, and to sell to the federally-sponsored Flathead Irrigation Project on demand, a block of power[2] at less than the fair and reasonable market value of such power; that the "total rentals from said license for use of Indian lands" are not being paid to them; and that defendant has thereby appropriated plaintiffs' property in breach of its fiduciary obligations to them.

For reasons which follow, it is concluded that plaintiffs are not entitled to recover on this claim.

I

Following trial, in 1968, of the claim stated in Paragraph 13, the court held that plaintiffs' proof, directed solely to the value of the power made available to the Flathead Irrigation Project pursuant to the terms of License No. 5, Montana, did not "jibe with the applicable rule of damages."[3] Confederated Salish and Kootenai Tribes v. United States, 417 F.2d 1340, 1341, 189 Ct.Cl. 319, 322 (1969). The correct test, the court ruled, was "what, if anything, the Tribes lost from the requirement that the licensee sell the 15,000 horsepower to the Federal Government at the lesser rates specified in the license."

For reasons stated,[4] the court remanded this claim for new trial, "vacating

1. Act of July 30, 1946, 60 Stat. 715, quoted in part in finding 1(a). All other claims stated in the petition have now been disposed of.

2. See finding 38(c)(4) for the license provisions respecting the 15,000 horsepower here involved. The Rocky Mountain Power Company was a wholly-owned subsidiary of the Montana Power Company. In 1939, License No. 5, Montana, was transferred from subsidiary to parent.

3. Plaintiffs still "disagree with the Court" as to the proper measure of damages, and "preserve their prior position" on this question. Finding 1(e). *Cf.* Alabama Power Co. v. Federal Power Commission, 146 U.S.App.D.C. 255, 450 F.2d 716 (1971).

4. The first was that, at Federal Power Commission hearings prior to the issuance of License No. 5, Montana, the Rocky Mountain Power Company had estimated an annual out-of-pocket loss of $62,500 from furnishing 15,000 horsepower to defendant on terms and at rates subsequently included in License No. 5, Montana; Assistant Commissioner of Indian Affairs J. Henry Scattergood had calculated, however, that the annual loss

the prior commissioner's opinion and findings so that the parties can start afresh and direct their presentation to the correct measure of damages." [5] In so doing, the court stressed that:

> * * * we are in no way holding that plaintiffs have yet proved any loss * * *. The issue of the existence of a loss, as well as of the amount, remains to be tried again. To recover, plaintiffs must prove that a supposititious willing buyer desiring to develop the site for power purposes, and able to obtain the necessary license, would have paid, and a willing owner would have accepted, a higher rental than the amount actually paid, if the former had not been burdened with the necessity to sell at the prescribed rate the block of 15,000 horsepower to the Federal Government, and then the plaintiffs must show the probable amount of that excess.

## II

The history of the development of Flathead Site No. 1 (now known as Kerr Dam), detailed in the accompanying findings of fact, extends far into the past. And, the breadth, and implications, of certain of the contentions here advanced, particularly by defendant and *amici curiae*,[6] suggest that decision respecting some of them might have impact extending beyond both the present time and the present forum. Neither lengthy historical exploration nor con-

sideration of many of the issues raised by the parties (and by *amici curiae*) is, however, essential to decision on the claim stated in Paragraph 13.

## III

The pivotal issue here is "what, if anything, the Tribes lost from the requirement that the licensee sell the 15,000 horsepower to the Federal Government at the lesser rates specified in the license." [7] As defendant correctly urges, this necessitates inquiry (1) whether or not a "supposititious willing buyer" would have anticipated an annual loss in consequence of the requirement for furnishing 15,000 horsepower to defendant at prescribed rates, and (2) even if so, whether or not such an anticipation of loss would have had any depressive effect upon rentals otherwise payable to plaintiffs. Plaintiffs' argument that the "sole issue is * * * the amount of the cost-loss, if any, incurred by the Company * * *" in consequence of that requirement is plainly untenable.

At trial on remand, the questions stated above were explored, with the aid of expert witnesses, in some depth. The testimony of plaintiffs' expert is summarized in finding 41. That of defendant's experts is summarized in finding 42.

Plaintiffs' expert expressed no opinion of his own as to the amount of annual loss (if any), to a prospective licensee,

---

would be "only $25,336". After reciting these estimates, the court stated:

"* * * the power company probably incurred an annual loss in supplying the 15,000 horsepower to the Federal Government. From that significant fact it would appear, at least *prima facie*, that the licensee would probably have been willing to raise its payments to the Indians, to some extent, if that loss were removed. The serious problem posed by this fact of a substantial annual loss for the licensee on the required sale calls for further exploration to see whether, in fact, the loss on the sale of this block of 15,000 horsepower would have any effect on the rentals payable to the Tribes."

5. Judge Skelton, dissenting, "would * * * dismiss plaintiff's suit."

6. The Flathead, Mission, and Jocko Valley Irrigation Districts were granted leave by the court to participate as *amici curiae* in further proceedings before the commissioner if they wished to do so. The Irrigation Districts have been permitted (within limits specified in a Commissioner's Order filed herein April 22, 1970) to participate in such proceedings.

7. Confederated Salish and Kootenai Tribes v. United States, *supra*, 417 F.2d at 1341, 189 Ct.Cl. at 322.

realistically attendant upon the requirement for furnishing power to defendant at prescribed rates. The thrust of his testimony was, rather, that the Rocky Mountain Power Company's estimate of the annual loss which would result from furnishing power to defendant pursuant to the terms of the subsequently issued license was "more logical and realistic", and was "a better measure of that loss", than the Scattergood computation.[8] Given clear opportunity to do so, he declined to endorse either estimate as an accurate measure of the cost of what a licensee would "[have] to give up * * *" in consequence of the presently relevant terms of License No. 5, Montana. This gap in the proof is striking, and significant.

In contrast, defendant's experts were of the view that no loss would have resulted from such terms, and that, on proper analysis of all of the information actually available in 1929–30, any prospective licensee should have concluded that the cost of furnishing such power would be less then the revenues to be derived therefrom, taking pertinent factors into consideration.

Defendant's experts were, moreover, of the opinion that in any event any loss anticipated by a prospective licensee could and would have been passed on in full to the licensee's ratepayers, and thus would have had no adverse economic impact on either the licensee or Indian rentals.[9] They saw no relation between any such anticipated loss and the amount of rentals payable to plaintiffs.[10]

■ Weighing the conflicting evidence, plaintiffs clearly do not have the better of the proof. And, the burden is

theirs. The result is considerable impact on plaintiffs' argument that "a licensee not burdened with the bargain power requirement would have paid rentals higher by the amount which it estimated the requirement would cost it", and that they have established that "cost."

■ Upon consideration of the expert opinions adduced at trial and the remainder of the record, it is concluded that plaintiffs have failed to prove by a preponderance of the evidence that a prospective licensee would have anticipated an annual loss in consequence of the requirement for furnishing the 15,000 horsepower to defendant at prescribed rates, or, assuming a prospective licensee would have anticipated an annual loss in consequence of such a requirement, that the anticipation of loss would have diminished the rentals payable to plaintiffs but for the said requirement.[11]

In sum, plaintiffs have not met their burden of proof. Accordingly, as to the claim stated in Paragraph 13, the petition should be dismissed.

## PART TWO

Plaintiffs fault the trial commissioner's opinion, *supra*, for failing, in their eyes, to consider adequately the fiduciary relationship of the Federal Government toward these Indians with respect to the use of their land for power purposes. This argument, much emphasized before the judges, is as follows: (1) In negotiating with the company on the terms of the license and the compensation for the Tribes, the United States was subject to trust obligations toward the Tribes; (2) during the negotiations, the United States had con-

---

**8.** Plaintiffs' expert recognized that "refinements" to the methods used by each could be made, but did not undertake to do so in any depth.

**9.** Mr. Scattergood had expressed a like view in 1929. Plaintiffs' expert recognized the probability of regulatory recoupment, but thought a prospective licensee would not be influenced by it.

**10.** Plaintiffs offered no proof by way of rebuttal.

**11.** Nor, assuming a prospective licensee would have anticipated an annual loss in consequence of such a requirement, and some resulting detriment to plaintiffs, have plaintiffs furnished a basis by which the probable amount thereof might reasonably be determined. *Cf.* Navajo Tribe v. United States, 364 F.2d 320, 176 Ct.Cl. 502 (1966).

flicting interests revolving around its concern for the irrigation project and, because it insisted on obtaining cheaper power for the project, may well have failed to protect the rights of the Indians by achieving the level of rentals for the Indians which would have otherwise been obtained; (3) since the United States breached its fiduciary duty by seeking special rights for the irrigation project at the expense of the Tribes, the defendant has the burden of showing that the plaintiffs suffered no loss from this breach, rather than the burden of showing loss being on the plaintiffs— citing Navajo Tribe v. United States, 364 F.2d 320, 322–323, 324, 176 Ct.Cl. 502, 507–508, 509 (1966); and (4) there is sufficient evidence that the Indians necessarily suffered loss through the breach, and the defendant has failed to overcome that proof. In the ensuing discussion, we deal explicitly with this chain-of-reasoning, all of which stems from the basic charge of breach of trust.

From the start we assume with plaintiffs that the Federal Government had trust obligations toward them in negotiating and establishing the terms of the license. Our difficulty is that we fail to see the breach of that obligation—in the sense of a conflict of interest or other failure to observe the highest standards of conduct toward the beneficiary— which the Tribes so urgently press upon us. The alleged conflict of interest is said to arise from the Government's keen interest in recouping the $6,000,000 it had paid toward the irrigation project, and its insistence on low rates in order to help the project pay back that sum. To this is added (as well as lesser items) the statement by the company at the Power Commission hearing in 1929

that its out-of-pocket loss in furnishing cheaper power to the irrigation project would be $62,500 a year; the computation by Assistant Commissioner of Indian Affairs Scattergood that this loss would be only $25,336 per year; and testimony in 1929 by the company's president which plaintiffs understand as admitting that it "is simply a matter of figures" that the company (as licensee) could and would pay more to the Indians by way of rentals if it did not have to furnish the power to the reclamation project. From these (and some other) materials plaintiffs conclude that the position of the Federal Government was infected by a serious conflict of interest and by failure to pursue the Indians' interests as loyally as it should have.

Our study of the record leads us to the opposite conclusion—that there was no conflict of interest and no violation of fiduciary obligations by the Government. The chief negotiator for the United States, with respect to the tribal land, was Assistant Commissioner Scattergood. He authored two memoranda in 1929 and 1930 which carefully set out in detail the various factors bearing on the monetary terms of the proposed license. These documents show that Mr. Scattergood (and through him the Federal Government) was at great pains to preserve fully the Indians' interests and did not in any way allow the Government's concern with the needs of the irrigation project to detract from full protection of the tribal rights. The reports expressly state, repeatedly, that the amount and character of the Indian rentals were first considered on their merits wholly apart from the problem of cheaper power for the irrigation district.[12] The format and contents of

12. "In order that full justice be done to the Indians, it is proposed here to consider the case first as if there were only the first three parties [the company; the Indians; the general consumers] and no irrigation project, and thus to fix the proper intercompany price for the proforma calculation of the Indian rental; * * *." 1929 report, p. 32 (fdg. 33).

"The Indian Bureau has the double responsibility of protecting fully the tribal rights of the Indians in the matter of power rentals and also of doing everything possible to make a success of the Flathead Indian irrigation project committed to its care. It does not consider that these interests are really conflicting in the sense of the unfortunate dispute above referred to ['an unfortunate

the reports, which go fully and in great detail into all aspects of the problem, affirmatively bear out this deliberate representation, and we accept it as accurate. The remaining parts of the record, moreover, do not detract from this conclusion.[13] We are satisfied, therefore, that the Federal Government did not, in the thinking of its agents, subordinate the Indian interests to those of the reclamation project at the time of the negotiations for the license.

Plaintiffs argue, however, that, whatever Mr. Scattergood and the other federal representatives may have subjectively thought, they necessarily and inevitably subordinated the Indians' interests by failing to seek and obtain higher rentals once the company said that it would suffer a substantial loss in supplying the cheaper power to the irrigation district. The underlying assumption is, of course, that the company could and would pay higher compensation to the Indians if it were relieved of the obligation to furnish the irrigation electricity—and that the federal representatives should have realized this to be the fact.

There are at least two mortal defects in this essential postulate of plaintiffs' contention. The first is that there is very good reason to doubt that the company really considered that it would suffer any such out-of-pocket loss; it may very well have made the assertion simply for bargaining and tactical purposes. The Scattergood report carefully whit-

dispute on the question of the legality of the irrigation project's rights']. We have therefore first considered in this memorandum the matter of the Indian rental on its merits just as if there were no irrigation district at all; we have accordingly proposed what seems to be a fair rate of rental of $2.21 per horsepower * * *. This Indian rate of rental having thus been fixed, we can properly turn to the irrigation project and consider it as one special group of general consumers that the United States Government is particularly interested in protecting to the extent of 15,000 horsepower for pumping and for the project and for sale." 1929 report, p. 43 (see fdg. 35(a) and (b)).

"[Recognition of cheaper power for the project] does not mean, as some friends of the Indians may have feared, that the Indian Bureau does not recognize fully the rights of the Flathead Indian Tribe as the equitable owner of the power sites concerned. These rights are fully recognized and preserved and no precedent to the contrary can be set up from the disposition of this case." 1929 report, p. 46 (see fdg. 35(e)).

" * * * However, even if the load factors are as the applicant [the company] has estimated and a part is primary power, we have shown in our memorandum of December 30, 1929 [the first Scattergood report], that after the calculation of the Indian rental, by a slight increase in the intercompany price, the small cost of the power will be provided for without in any way affecting the Indian rental." 1930 report, p. 55 (see fdg. 36(g)).

"It may be added that in all our negotiations regarding the Indian rentals this matter of the irrigation power was completely ignored. It was recognized by the company's representatives, as well as by those representing the Government, that at Thompson Falls there will be developed, because of Flathead storage, more than twice as many additional kilowatt-hours than can possibly be used in the entire irrigation 15,000 horsepower demand. Hence, this delivery of this power can and will be provided without the slightest effect in reducing the Indian rental." 1930 report, p. 55 (see fdg. 36(g)).

13. Plaintiffs contend that the various rentals recommended in the Scattergood reports were between $40,000 and $153,000 per year above the rental later actually established in the license, and that the difference must represent the impact of the cheaper power requirement. We think the premise and conclusion are both inaccurate. Plaintiffs' figures for the originally-recommended rentals are based upon maximum rentals possible only if the power production far exceeded all predicted levels. As we understand the record, the fixed rentals finally adopted were entirely comparable to (or more than) the various rentals suggested in the earlier stages of the negotiations, including the rentals initially proffered by the power company. There is nothing substantial to suggest that the rentals were in fact lowered by the negotiating parties because of the requirement to sell irrigation power.

tles down any possible loss from $62,500 a year to $25,336 by showing the inflated and contrary-to-fact assumptions on which the company's statement was rested. This analysis indicates the unlikelihood that the prospective licensee put much stock in the higher figure it had put forth. The expert testimony at the trial before Commissioner Wood likewise supports this conclusion. Even the lesser Scattergood figure leaned heavily on the conservative side and did not take account of all significant factors.

Second, it seems that the company probably understood full well that any potential out-of-pocket loss on the sale of the irrigation power could and would be readily made up from other sources without affecting the Indian rental. The original intimation of the company's representative (Mr. Kerr) that it "is simply a matter of figures" that the company could pay more to the Indians if it did not have to furnish the reclamation power was severely limited in later testimony by the same Mr. Kerr at the Federal Power Commission hearing to the points that "it might be argued" that the Indian rental would be affected and that the cost of the irrigation power over the 50-year license "is a very debatable question." Mr. Scattergood considered that the company could recoup any possible loss by passing it on to the general consumer,[14] and in addition his second report observes (see note 12, *supra*) that "[i]t was recognized by the compa-

ny's representatives, as well as by those representing the Government, that at Thompson Falls there will be developed, because of Flathead storage, more than twice as many additional kilowatt-hours than can possibly be used in the entire irrigation 15,000 horsepower demand. Hence, the delivery of this power can and will be provided without the slightest effect in reducing the Indian rental." The reasonable inference is that the power company knew that the matter of furnishing the cheaper electricity to the project was separate and independent from the negotiation of the Indian rental. There was no inevitable or automatic connection between the two, and the Federal Government was under no mandate to assume that the company would probably pay more if relieved of the irrigation-power obligation.[15]

■ We conclude, therefore, that the Federal Government did not breach its fiduciary duty to the Indians, either subjectively or objectively, in dealing with the company. The Government did not misbehave—i. e., did not subordinate the plaintiffs' interest to its own or fail to protect fully the Indians' interest or use the Indians' property for its own purposes—in seeking the power for the irrigation district. Our affirmative finding is that the Government was free from such a taint.

On that finding the foundation of the argument plaintiffs stress before us is shattered, and we are left to consider

---

14. The expert testimony at the trial before Commissioner Wood supports this position.

15. Plaintiff's expert (Mr. Van Scoyoc) testified that, in his opinion, the company "would have been willing to have paid the tribes more had they not had to furnish the power to the irrigation project" and that if the company thought it would suffer a loss through the power requirement "it would have a direct effect" on its willingness to pay more in rentals in the absence of the requirement. But these unsupported conclusions are not persuasive, especially in the light of the whole record, either that the company itself thought it would suf-

fer a loss or that if it did so consider that fact would likely affect the rental it was willing to pay. (Mr. Van Scoyoc admitted that the loss would be recouped, but considered that to be immaterial.)

Plaintiffs also point to an opinion of the Solicitor's Office of the Power Commission objecting to the legality of the furnishing of power to the district, but that opinion simply assumes that this sale would necessarily divert revenues away from the Indians; that assumption is not proved or probed in the memorandum. (The Solicitor's opinion antedated the Scattergood memoranda which did go in detail into the assumption of diversion of revenues from the Indians.)

the plaintiffs' claim apart from any infection by conflict of interest or breach of trust. The rule of the *Navajo Tribe* case, imposing special requirements and allocation of burden of proof where the Government has definitely breached, or in all probability has broken, its trust obligation, is inapplicable to the present situation. This case must be viewed, rather, as a normal Indian claim in which the claimant has the burden of showing that it has received less than its entitlement—in this instance, the full "rentals from such [waterpower] licenses for use of Indian lands" which the Act of March 7, 1928, *supra*, declared "shall be paid the Indians of said reservation as a tribe." See Confederated Salish and Kootenai Tribes v. United States, 181 Ct.Cl. 739 (1967).[16] Put another way, the problem before the court is the same as if the plaintiffs' land were not held in trust but was owned by them outright, and they were claiming, as here, that the rentals established in the license did not fully compensate them for the power value of their property.

Accordingly, Commissioner Wood was entirely correct in posing the question as whether plaintiffs have met their burden of proof of showing a loss in that they have received less than the full statutory "rentals" Congress mandated. And, as we have already indicated, we think he was also correct in determining that plaintiffs failed in meeting that burden. On that point we need add nothing significant to his opinion (see Part One, *supra*)[17] or to the findings [deleted from published opinion].

## CONCLUSION

For the reasons given by the trial commissioner (Part One, *supra*), as augmented by Part Two, *supra*, and on the basis of our findings of fact, we conclude that plaintiffs are not entitled to recover on the claim stated in paragraph 13 of the petition and we dismiss that paragraph.

16. We do not agree with plaintiffs that in the 1928 Act Congress rejected the concept that, even though there was no effect on the Indian rentals, cheaper electricity could be provided for the irrigation district. There is no such prohibition in the Act or suggested by its legislative history. Insofar as the opinion of the Solicitor's Office of the Federal Power Commission (on which plaintiffs rely) may be thought to suggest otherwise, we think it errs in construing the statute. Insofar as that opinion assumes that the licensee's obligation to furnish irrigation power would in fact divert revenues from the Indians, the opinion rests on *ex parte* factual assumptions unsupported by the adversary record now before the court. See note 15, *supra*.

17. Two minor matters may be noted: (1) Plaintiffs make much of the fact that the commissioner did not observe in his opinion that plaintiffs' expert (Mr. Van Scoyoc) summarily testified at one point, on inquiry by the commissioner, that the company "did suffer a loss by furnishing this power at the particular rates to the irrigation project." The opinion does not deny that this was said, but emphasizes, properly, that Mr. Van Scoyoc expressed no opinion of his own as to the amount of the loss and refused to endorse either the Kerr figure or the Scattergood figure. The conclusory statement that a loss was suffered was wholly unsupported by the witness and is not of much help.

(2) Plaintiffs also note that our 1969 opinion (417 F.2d at 1341–1342, 189 Ct.Cl. at 323) said, as one reason for ordering a new trial, "that the present [then] record, defective though it is, does indicate that the power company probably incurred an annual loss in supplying the 15,000 horsepower to the Federal Government [footnote omitted]. From that significant fact it would appear, at least *prima facie*, that the licensee would probably have been willing to raise its payments to the Indians, to some extent, if that loss were removed." That preliminary observation was made, of course, on the basis of the then record, and was obviously subject to modification in the light of the fuller record expected to be made, and actually made, on the ensuing retrial.